UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANNA MOHR-LERCARA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>vs.<br><br>OXFORD HEALTH INSURANCE, INC., OPTUM, INC., and OPTUM RX, INC.,<br><br>Defendants. | Civil No. 7:18-cv-1427<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL<br><br>February 16, 2018<br><br><u>REDACTED</u> |

Plaintiff Anna Mohr-Lercara ("Plaintiff"), by her undersigned attorneys, alleges the following based upon her knowledge as set forth herein and upon information and belief. Further additional evidence supporting the claims set forth herein can be obtained after a reasonable opportunity for discovery.

## INTRODUCTION

1.      Plaintiff, who received prescription drug benefits through a group health plan issued or administered by Oxford Health Insurance Inc. (the "Plan"),[1] brings this action on behalf of herself and a Class and Subclass of similarly situated persons alleging (a) violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., and (b) violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

---

[1] Unless otherwise specified, the term "Plans" as used herein includes both health plans that are funded by an employer but administered through "administrative-services-only" ("ASO") contracts between one or more Defendants and the plan, and health plans implemented through an insurance policy underwritten and issued by one or more Defendants to cover medical and prescription drug expenses incurred by the plan. "Plans" also includes both public and private plans and governmental program plans, such as Affordable Care Act, and Medicare Part D or PDP plans. "Plans" subject to ERISA are denoted "ERISA Plans."

1961, *et seq.*, resulting from Defendants' common fraudulent and deceptive scheme to artificially inflate prescription costs causing consumers to pay more than they otherwise should have paid for medically necessary prescription drugs.

2.     About 90% of all United States citizens are now enrolled in private or public health plans that cover some, or all, of the costs of medical and prescription drug benefits.  A feature of most of these plans is the shared cost of prescription drugs.  Normally, when a patient[2] fills a prescription for a medically necessary prescription drug under his or her health care plan, the plan/insurer pays a portion of the cost and the patient pays the remaining portion of the cost directly to the pharmacy in the form of a cost-sharing payment such as a copayment or a coinsurance or deductible payment.  Pharmacies are required by contract to collect the payments on Defendants' behalf from patients at the time the prescription is filled and are not allowed to waive or reduce the amount collected under the Plans.

3.     Defendant Oxford Health Insurance, Inc. ("OHI"), provides and administers health and pharmacy benefits to patients.  OHI provides these pharmacy benefits in part through Optum, Inc., and Optum Rx, Inc. (collectively, "Optum"), which is a pharmacy benefit manager ("PBM").  Optum's PBM services include, *inter alia*: managing a network of pharmacies that will serve as participating pharmacies at which OHI patients obtain prescriptions; working with OHI to set and dictate copayment amounts, coinsurance amounts, and deductibles (if applicable) to pharmacies; and processing prescription drug claims and interfacing with patients and pharmacies regarding applicable prescription drug coverage.

---

[2] The term "patient" refers to a plan participant or beneficiary under a prescription drug Plan issued or administered by one or more Defendants who purchases prescription drugs pursuant to that Plan.

4.     As set forth below, Defendants and their co-conspirators have engaged in a scheme to defraud patients by overcharging patients for the cost of medically necessary prescription drugs. Patients, including Plaintiff and the Class (defined below), pay excess charges to participating pharmacies in exchange for receiving their prescription drugs.   Unbeknownst to the Class members, Defendants misrepresented the purported costs of the prescription drugs in the form of increased charges to patients; the payments of these excess charges were then either retained by the pharmacies or "clawed back" from the pharmacies by Defendants.

5.     For example, as detailed below, the express language of Plaintiff's 2011-13 Plan with OHI promised that she would not pay more for prescription drugs than Defendants' "contracted fee" with pharmacies (*i.e.,* the amount Defendants paid to pharmacies for the covered drugs).  Similarly, her 2014 contract provided that she would not pay more for prescription drugs than the "Allowed Amount," which is "the amount we have negotiated with" the pharmacies for the drugs (again, the amount Defendants paid to pharmacies for the covered drugs).  Accordingly, Defendants agreed that Plaintiff and the Class would not pay more than the amount Defendants agreed to pay to participating pharmacies for Plaintiff's prescription drugs.

6.     Contrary to the express language of the Plans, Defendants exercised their unilateral discretion to require network pharmacies to charge Plaintiff and the Class unauthorized and excessive amounts for prescription drugs that far exceeded the amount paid to the pharmacies ("Overcharges"), ***sometimes overcharging Plaintiff by more than 250%.***

7.     Moreover, Defendants "clawed back" some or all of these Overcharges by forcing the pharmacies to pay the Overcharges to Defendants after the pharmacies collected them from Plaintiff and the Class.

8.      For example, on October 30, 2015, Defendants unilaterally determined that Plaintiff had to pay a $15 copayment to a pharmacy to purchase a prescription drug and required the pharmacy to collect this amount from the patient. Unbeknownst to Plaintiff, the $15 copayment Defendants required the pharmacy to collect from her was a premium of over **250% over the contracted fee** the pharmacy was paid to fill the prescription. Specifically, Defendants contracted with the pharmacy to pay the pharmacy only $▮▮▮ for the prescription. But, Defendants unilaterally directed and required the pharmacy to charge and collect the $15 copayment from Plaintiff, thereby forcing Plaintiff to pay not only ▮▮▮ contracted cost of the drug, but an additional $▮▮▮. The unlawful Overcharge between the copayment Plaintiff was charged ($15), and the amount she should have been charged ($▮▮▮), is known as spread ("Spread").

9.      Defendants initially allowed pharmacies to keep Spread and other Overcharges. However, during the Class Period, Defendants began requiring the pharmacies to turn over the Overcharges to Defendants, which payment from the pharmacy to the Defendants is known as a "Clawback."

10.     Had Defendants lived up to their fiduciary, disclosure, and other legal obligations, Plaintiff would not have paid more than the $▮▮▮ amount the pharmacy agreed to be paid by Defendants for this prescription drug. Defendants should have and easily could have exercised their unilateral discretion to comply with the terms of Plaintiff's Plan and determine that the pharmacy should charge and collect from Plaintiff, at a maximum, only ▮▮▮. Instead, Defendants exercised discretion to impose a premium of over 250% beyond the total amount the pharmacy should have charged and required the pharmacy to collect that amount from Plaintiff.

11.     Defendants violated the Plans and breached their fiduciary duties by exercising their discretion to secretly determine that patients must pay inflated copayments and coinsurance

- 4 -

and deductible payments and then directing pharmacies to collect those inflated copayments and coinsurance and deductible payments on their behalf (which Overcharges were then either retained by the pharmacies or remitted to Defendants in the form of Clawbacks).

12.     Defendants misrepresented to Plaintiff and the Class the cost-sharing amounts under the Plans and that their cost-sharing amounts were based on the actual costs for the drugs, when, in fact, patients were charged and paid more than the actual costs of the drugs.  Defendants utilized the U.S. Mail and interstate wire facilities to engage in their fraudulent billing scheme in violation of RICO.

13.     In order to implement Defendants' fraudulent Overcharge scheme, Defendants' contracts with participating pharmacies required the pharmacists not to disclose the existence of the Overcharges or Clawbacks or the fact that a patient could, in certain circumstances, be required to pay more for a prescription drug than if the patient did not have any insurance at all.  As a result of these "gag clauses," the Overcharges remain hidden from participants and beneficiaries.

14.     Defendants' fraudulent scheme to artificially inflate the costs for medically necessary prescription drugs by overcharging patients, and then to surreptitiously allow pharmacies to retain Overcharges or to take Clawbacks is inconsistent with the purposes of the health care system.  For one, patients are paying higher amounts than they otherwise would have paid had Defendants not artificially inflated the payment amounts.  Patients are supposed to save money through the use of pharmacy benefits, but in reality, they are charged excessive amounts.

15.     Indeed, the very purpose of obtaining or participating in a health plan that includes pharmacy benefits is to enable patients to benefit from the insurance company's and PBM's negotiating and buying power with prescription drug manufacturers.  This should result in *reduced* costs for prescription drugs. Patients also pay substantial premiums and other costs and fees, which

should cover the other aspects of the prescription drug plans, including their administration. Moreover, PBMs and Plan providers such as Optum and OHI are paid significant fees as compensation for their services that are entirely separate from the Clawbacks at issue here, making the Clawbacks excess, undisclosed profit in exchange for little to nothing.

16.     As a result of Defendants' fraudulent scheme to collect this Overcharge, Defendants overcharged Plaintiffs and the other Class members for prescription drugs during the Class Period (defined below).  Defendants' misconduct has caused Plaintiff and the other Class members to suffer significant damages. Plaintiffs seek relief as follows:

17.     With regard to ERISA, under Count I, ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce her rights under the terms of the plan or to clarify her rights to future benefits under the terms of the plan. Defendants have violated the ERISA Plans by establishing the Overcharges, including Spread, and by taking illegal Clawbacks as alleged below and should not be allowed to continue to do so.

18.     Under Count II, ERISA § 406(a), 29 U.S.C. § 1106(a), provides that a party in interest shall not receive direct or indirect compensation unless it is reasonable and prohibits transfers of plan assets and use of plan assets by or for the benefit of fiduciaries and plan service providers.  In setting the amount of and taking excessive undisclosed Overcharge compensation and Clawbacks, Defendants allowed and received unreasonable compensation and misused the assets of the ERISA Plans, including participant contributions paid at the pharmacy counter and the Plan contracts that provided Defendants with the ability and discretion to extract these funds from patients.

19.     Under Count III, ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not deal with plan assets in its own interest or for its own account, act in any transaction

involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.  In setting the amount of and taking Overcharge compensation and Clawbacks, Defendants set their own compensation, received plan assets and consideration for their personal accounts in violation of this provision, and were acting under other conflicts of interest.

20.    Under Count IV, ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  By setting the amount of excessive undisclosed Overcharges and by engaging in Clawbacks, Defendants have breached their fiduciary duties of loyalty and prudence.

21.    Under Count V, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which it may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Defendants breached all three provisions.

22.    Under Count VI, Defendants had actual or constructive knowledge of and participated in and/or profited from the prohibited transactions and fiduciary breaches alleged in Counts II-IV by the Defendants who are found to be fiduciaries, and are liable to disgorge ill-

gotten gains and/or plan assets and to provide other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

23.     With regard to RICO, under Count VII, OHI has engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(c), by overcharging patients for the cost of medically necessary prescription drugs alleged below and is liable to Plaintiff and the Class for all statutory remedies.

24.     Under Count VII, Optum has engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(c), by overcharging patients for the cost of medically necessary prescription drugs as alleged below and is liable to Plaintiff and the Class for all statutory remedies.

25.     Under Count IX, Defendants have engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(d), by overcharging patients for the cost of medically necessary prescription drugs as alleged below and are liable to Plaintiff and the Class for all statutory remedies.

26.     As further alleged below, Plaintiff seeks to represent a nationwide Class of all insureds and plan participants whose health Plans are insured or administered by OHI and Optum, as well as the ERISA Subclass.

## JURISDICTION

27.     **Subject Matter Jurisdiction.**  This court has subject matter jurisdiction over this action pursuant to (a) 28 U.S.C. § 1331, which provides for federal jurisdiction over civil actions arising under the laws of the United States, including ERISA and RICO; (b) 29 U.S.C. § 1132(e)(1) providing for federal jurisdiction of actions brought under Title I of ERISA; and (c) 18 U.S.C. § 1964 providing for federal jurisdiction to prevent and restrain violations of 18 U.S.C § 1962. Further, declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 58 and 65 of the Federal Rules of Civil Procedure.

28.     **Personal Jurisdiction.**  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process.  Upon information and belief, Defendants are residents of the United States and subject to service in the United States, and this Court therefore has personal jurisdiction over them. Defendants have also conceded jurisdiction in this Court, insofar as Plaintiff's 2014 Plan states that any dispute "***must*** be resolved in a court located in the State of New York" (emphasis added).  This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New York. Defendants may be found in this District and conduct substantial business herein: Defendants are authorized to do business in the State of New York; Defendants conduct business in the State of New York and in this District; Defendants advertise and promote their services in the State of New York and in this District; Defendants have sufficient minimum contacts with the State of New York; Defendants administer health plans and pharmacy benefits under those plans from the State of New York; and/or Defendants otherwise intentionally avail themselves of the markets in the State of New York through the marketing and sale of insurance and related products and services in this State so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

29.     **Venue.**  Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Defendants contractually ***required*** that any actions be venued in this District (as set forth above) and because a substantial part of the events giving rise to the claims herein occurred within this District and/or a substantial part of property that is the subject of the action is situated in this District.  Venue is also proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants may be found in this District and some or all of the fiduciary breaches or other violations for which relief is sought occurred in or originated in this District.

Venue is also proper in this District pursuant to 18 U.S.C. § 1965, because Defendants are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

## PARTIES AND NON-PARTIES

30.     Plaintiff Anna Mohr-Lercara ("Plaintiff") is a citizen of Florida.  Plaintiff was covered by an OHI health plan, a fully insured health plan provided through her employer.  Plaintiff received prescription drug coverage from OHI under a form "G PPO 25/40 F NG OHI" PPO group policy purchased through her employer for her benefit.  This policy is a welfare benefit plan subject to ERISA.  Upon information and belief, Plaintiff's plan was serviced and administered by Optum.  Under the plan, Plaintiff Mohr-Lercara was obligated to pay copayments of $10-$75 per prescription for certain categories of drugs, and copayments of $25-$187.50 after payment of the $100 deductible for other categories of drugs.  As a result of Defendants' scheme, Plaintiff Mohr-Lercara has been injured by paying inflated amounts for medically necessary, covered prescription drugs.

31.     Defendant OHI is a licensed health insurance company incorporated in New York with its principal place of business in Trumbull, Connecticut.  OHI is a wholly-owned subsidiary of UnitedHealth Group, Inc. ("United").

32.     Defendant Optum, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  Optum, Inc. is a subsidiary of United that manages OHI's pharmacy benefits.

33.     Defendant OptumRx is a California corporation with its principal place of business located in Irvine, California.  OptumRx operates as a subsidiary of Delaware corporation OptumRx Holdings, LLC, which in turn operates as a subsidiary of Optum, Inc.  OptumRx serves as a PBM for OHI.

**SUBSTANTIVE ALLEGATIONS**

**Health Insurance in General in the United States**

34.     Over 90% of health care beneficiaries in the United States have a health care plan (either private or public) that covers all, or a portion of, their medical and pharmaceutical expenses.

35.     Health insurance is paid for by a premium paid for medical and prescription drug benefits for a defined period; or through employer plans that either provide benefits by purchasing group insurance policies, or are self-funded but administered by health insurance companies and their affiliates. Premiums and contributions for coverage in all types of plans can be paid by individual plan participants or beneficiaries, employees, unions, employers or other institutions.

36.     If a Plan covers outpatient prescription drugs, the cost for prescription drugs is typically shared between the patient and the Plan.  Such cost sharing can take the form of deductible payments, coinsurance payments, and copayments.  In general, deductibles are the dollar amounts the patient pays during the benefit period (usually a year) before the Plan starts to make payments for drug costs.  Coinsurance generally requires a patient to pay a stated percentage of drug costs.  Copayments are generally fixed dollar payments made by a patient toward drug costs.

**The Pharmacy Benefits Industry and Pharmacy Benefits Managers**

37.     The pharmaceutical benefits industry consists of complex arrangements between numerous entities, including, but not limited to, drug manufacturers, drug wholesalers, PBMs, pharmacies, health insurance companies, employers, and health plan participants and beneficiaries.

38.     On the drug distribution side of the market, the drug manufacturer typically sells drugs to a drug wholesaler, which in turn sells the drugs to a retail pharmacy.  Payments for the drugs in turn go from the retail pharmacy to the wholesaler and to the manufacturer.  The retail

pharmacy then distributes drugs to patients from its inventory.   Neither the PBM nor the insurer/administrator is involved in the distribution of prescription drugs.

39.     The retail payment side of the market for drugs is largely directed and controlled by insurance companies and their contracted or owned PBMs.   In most instances where a health plan provides for prescription drug benefits, a PBM is the agent of the insurance company hired to participate in administering the prescription drug component of a health plan.   For example, Optum acted as OHI's agent in participating in administering OHI's prescription drug plans during the Class Period.

40.     When a patient presents a prescription at a pharmacy, key information such as the patient's name, drug dispensed and quantity dispensed is input into the pharmacy computer and transmitted via interstate wire to a "switch" that then directs the information to the correct PBM. The PBM instantaneously processes the claim.   The prescription is supposed to be processed in accordance with a patient's Plan which, as alleged herein, did not occur.   The PBM then electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and patient are covered and, if so, the amount the pharmacy must charge to and collect from the patient as a copayment, coinsurance, or the amount to be paid toward a deductible.

41.     The PBM is supposed to pay the pharmacy any amounts owed to the pharmacy over the copayment, coinsurance or deductible amount paid by the patient approximately every two weeks for the claims that were processed by any given pharmacy in the prior two-week period.

42.     If the patient's payment is greater than the amount that the insurer/administrator or its PBM has negotiated to pay the provider pharmacy, however, there will be a "negative reimbursement" to the pharmacy for the difference between the patient's payment and the actual

cost of the drug to the insurer or its PBM.  The "negative reimbursement" is paid by the pharmacy to Defendants as part of the reconciliation every two weeks.

**The Patient–Insurer/Administrator–PBM–Pharmacy Contractual Relationships**

43.     Contractual relationships exist between the employer or individual and the health insurance company that underwrites and/or administers the plan; the insurer/administrator and the PBM; and the PBM and the pharmacy.  An employer or individual buys prescription drug coverage or prescription drug benefit administration services from a health insurance company to provide prescription drug benefits for its employees under health plans.  Health insurance companies then hire PBMs to manage the prescription drug benefits offered pursuant to their policies and ASO contracts.

44.     The following diagram represents (in simplified form) the contractual relationships among the parties:



(a)     **Employer/Individual–Insurer Agreements (*i.e.*, Health Plans).** Employers and individuals buy prescription drug coverage to provide prescription drug benefits. These plans contain uniform provisions that set forth key terms such as the mechanism for and amount of the deductible, copayment, and/or coinsurance that a patient must pay to obtain prescription drug benefits.  Plaintiffs and Class members are intended beneficiaries of such agreements and they are participants and beneficiaries in the plans.

(b)     **Insurer–PBM Agreements**.  Health insurance companies, such as OHI, contract with and/or own PBMs such as Optum, which act as their agents in administering the prescription drug benefits purchased through the health plans that the insurers issue or administer.

(c)     **PBM–Pharmacy Agreements**.  PBMs in turn, contract with pharmacies, which serve as providers in the insurers/administrators' pharmacy network.  The pharmacies fill prescriptions that are health benefits covered under the plans.  Pursuant to these agreements, the PBMs participate in setting the amount that a pharmacy will collect from a patient for a prescription drug, including the Overcharge, the amount the PBM (and insurer or plan) will pay the pharmacy for filling the patient's prescription, and the amount of the patient's payment that the pharmacy must send to the insurer and PBM as a Clawback.  The pharmacy has no role in setting the amount of the patient's payment or overcharge and thus must collect and remit to Defendants the amount overcharged as determined by the PBM and insurer.

45.     The relationship among the parties is shown graphically as follows:



46.     Pursuant to the health plans, an insurer must ensure that, when it contracts with and directs a PBM to act as its agent to manage prescription drug benefits, the PBM follows the plans' terms, such that patients are not overcharged for their prescription drug benefits.

47.     To the contrary, PBMs, acting as agents and/or in concert with health insurance companies, routinely require that patients pay substantially higher prices for prescription drugs than are allowed under the plans. As alleged herein, Defendants engaged in such practices with respect to Plaintiff's Plans by charging her an excessive copayment.

**Defendants' Plans with Plaintiff**

48.     Plaintiff had two different Plans during the Class Period.  Neither, however, allowed Defendants or pharmacies to charge or collect Overcharges or allowed for Clawbacks.

49.     Plaintiff's 2011-13 Plan provides that Plaintiff's cost-sharing for drugs purchased from Network Pharmacies is the "***lower*** of" (1) "the applicable Out-of-Pocket Expense" or (2) the "Usual and Customary Charge:"[3]

> **Network Pharmacies:** For Prescription Drug Products at a
> retail Network Pharmacy, you are responsible for paying the
> lower of:
> * the applicable Out-of-Pocket Expense; or
> * the Network Pharmacy's Usual and Customary Charge
>   (which includes a dispensing fee and sales tax) for the
>   Prescription Drug Product.

50.     "Out-of-Pocket Expense," in turn, is defined as the amounts set forth in the "Summary of Benefits:"

> *Out-of-Pocket Expenses or Cost-Share:* The applicable Copayments, Deductibles and Coinsurance listed in your
> Summary of Benefits.

51.     The "Summary of Benefits" specifically states that "Outpatient Prescription Drugs" purchased from a Network Pharmacy are "Covered Services."

---

[3] The "Usual and Customary Charge" is "the usual fee that a pharmacy charges individuals for a Prescription Drug Product without reference to reimbursement to the pharmacy by third parties."

OXFORD HEALTH INSURANCE, INC.

| Covered Services | In-Network |
|---|---|
| Supplemental Coverage | |
| Outpatient Prescription Drugs | Subject to a separate deductible of $100.  The deductible is waived for Tier 1 Drugs. |

52.     In describing Plaintiff's "Financial Responsibility" for "Covered Services," the 2011-13 Plan states that "Network Providers [such as Network Pharmacies]" have agreed to accept our contract fees as payment in full" and Plaintiff "will not be responsible for any amount billed in excess of the contracted fee:"

**Your Financial Responsibility For In-Network Benefits**

In-Network benefits are typically provided through arrangements with Network Providers. Network Providers have agreed to accept our contracted fees as payment in full for Covered Services. We reimburse the Network Provider directly when you receive Covered Services and you will not be responsible for any amount billed in  excess of the contracted fee for the Covered Service.

53.     Accordingly, given the "lower of" provision discussed in ¶ 51 above, Plaintiff, under the 2011-13 Plan, should not pay any amount for the "Covered Services" of "in Network" "Outpatient Prescription Drugs" that is "in excess of the contracted fee" Defendants paid "Network Pharmacies."

54.     Similarly, Plaintiff's 2014 Plan states that she will pay the "lower of" the "applicable Cost-Sharing" or the "Usual and Customary Charge" for purchases from Network Pharmacies.

**Participating Pharmacies:** For Prescription Drugs purchased at a retail or mail order or designated Participating Pharmacy, You are responsible for paying the lower of:

- The applicable Cost-Sharing; or
- The Participating Pharmacy's Usual and Customary Charge (which includes a dispensing fee and sales tax) for the Prescription Drug.

(Your Cost-Sharing will never exceed the Usual and Customary Charge of the Prescription Drug.)

55.     Copayments are a form of "Cost-Sharing" in Section IV of the 2014 Plan.

## Section IV - Cost-Sharing Expenses And Allowed Amount

**Copayments.** Except where stated otherwise, after You have satisfied the annual Deductible as described above, You must pay the Copayments, or fixed amounts, in the Schedule of Benefits in Section XV – Schedule of Benefits of this Certificate for Covered Services. However, when the Allowed Amount for a service is less than the Copayment, You are responsible for the lesser amount.

56.     The Allowed Amount, the maximum Copayment, is the amount paid to the Network Pharmacy.

**Allowed Amount.** "Allowed Amount" means the maximum amount we will pay to a Provider for the services or supplies covered under this Certificate, before any applicable Deductible, Copayment, and Coinsurance amounts are subtracted. We determine our Allowed Amount as follows:

- The Allowed Amount for Participating Providers will be the amount we have negotiated with the Participating Provider.

57.     Accordingly, under the 2014 Plan, Plaintiff should not pay a Copayment that is more than the amount Defendants agreed to pay the Network Pharmacy.

58.     Health insurance policies are subject to state regulation. The policy forms typically must be filed with and approved by the appropriate state regulators.

59.     Because they are approved form plans, the relevant terms of the Plans benefitting Plaintiff are substantively the same as those applicable to the Class. For this reason, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class.

60.     Further, OHI uses uniform prescription drug plan terms in their Plan contracts to provide prescription drug coverage. These terms of the Plans—and more importantly how these Plans are administered by OHI and Optum—do not differ materially across Plans. Accordingly, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class, regardless of the funding arrangement underpinning the health Plan benefits that Defendants offer and administer.

**Plaintiff's Purchases**

61.     During the time that Plaintiff was covered by the Plans, Plaintiff purchased prescription drugs for which she was required to make copayments, coinsurance, and/or deductible payments in excess of the amounts provided for by her Plans, including at least the following specific purchases:[4]

| Filled Date | Usual And Customary | Approved Ingredient Cost | Approved Dispensing Fee | Amount Paid to Pharmacy | Copay | Spread / Clawback |
|---|---|---|---|---|---|---|
| 10/30/2015 | | | | | $15.00 | |
| 10/30/2015 | | | | | $15.00 | |
| 10/30/2015 | | | | | $15.00 | |
| 10/30/2015 | | | | | $15.00 | |
| 10/02/2015 | | | | | $15.00 | |
| 10/02/2015 | | | | | $15.00 | |
| 10/02/2015 | | | | | $15.00 | |
| 10/02/2015 | | | | | $15.00 | |
| 09/08/2015 | | | | | $10.00 | |
| 09/08/2015 | | | | | $15.00 | |
| 09/01/2015 | | | | | $15.00 | |
| 08/31/2016 | | | | | $15.00 | |
| 07/26/2016 | | | | | $15.00 | |
| 04/12/2016 | | | | | $15.00 | |
| 03/10/2016 | | | | | $15.00 | |
| 03/10/2016 | | | | | $15.00 | |

---

[4] For confidentiality reasons, Plaintiff has not specified the drugs they purchased, but if relevant, they will disclose such information during discovery after entry of an appropriate protective order. She has also redacted the pricing information which Defendants contend is confidential. She will file a motion to file an unredacted Complaint when a judge is assigned to the case.

62.     As set forth above, Plaintiff was illegally charged Overcharges for these prescription drugs in excess of the amounts permitted by her Plans.  Upon information and belief, Defendants then "clawed back" these Overcharges from Plaintiff's pharmacy.

**Patients, Participants and Beneficiaries in Defendants' Health Plans Pay**
**Undisclosed, Unauthorized and Excessive Fees for Prescription Drugs**

63.     Defendants have engaged in a scheme to charge Plaintiff and other patients cost-sharing amounts that are routinely higher than the prices Optum pays the pharmacies for providing the drugs to the patients in violation of the Plans as alleged above. This is particularly true for many low-cost, high-volume generic prescription drugs.

64.     Defendants "utilize Optum's technology and service platforms, retail network contracting and claims processing services" to carry out this Overcharge and Clawback Scheme.

65.     Optum's Provider Manual provides that Optum "acting on behalf of applicable Client or Benefit Plan Sponsor," will process claims for medically necessary prescription drugs dispensed to Plaintiff and Class members.[5]

66.     The Provider Manual explains the mechanism by which Defendants conducted the scheme.[6]

(a)     The Provider Manual "includes the policies and procedures" applicable to all pharmacies participating in Optum's pharmacy network and "is incorporated into and is a part of" the pharmacies' agreements with Optum.

---

[5]     OptumRx Provider Manual (2d ed. 2017) at 44.

[6]     OptumRx Provider Manual (2d ed. 2017), *available at*: https://learn.optumrx.com/content/dam/orx-rxmicros/pharmacy-manual/2017_pharmacy_manual.pdf.

(b)    The Provider Manual provides that Optum "shall communicate to [pharmacies] (via the POS System) the Cost-Sharing Amounts (e.g. Co-payment and Deductible) applicable to Covered Prescription Services."[7]   Optum directs that pharmacies "shall collect the full Cost-Sharing Amounts" from Plaintiff and Class members purchasing medically necessary prescription drugs.[8]   Optum directs that pharmacies "must charge . . . the Cost-Sharing Amount indicated in [Optum's] online response and only this amount."[9]   Optum dictates that waiving the Cost-Sharing Amount by pharmacies is "strictly prohibited . . . and is considered a material breach of the Agreement."[10]

(c)    The Provider Manual provides that "reimbursement pricing information, as well as prices paid to [pharmacies] . . . are "confidential and proprietary. . . ."[11]

(d)    The Provider Manual provides that "[f]ailure to adhere to any of the provisions . . . which includes this [Provider Manual] . . . will be viewed as a breach of the Agreement."[12]   Pharmacies are "subject to penalties or sanctions" if Optum determines that the pharmacies "disclosed confidential information. . . ."[13]   These penalties include "at a minimum . . . $5,000 per incident," and pharmacies "may be subject to additional actions" by Optum, "up to

---

[7] *Id.* at 15.

[8] *Id.*

[9] *Id.* at 57.

[10] *Id.*

[11] *Id.* at 58.

[12] *Id.* at 105.

[13] *Id.*

termination from participation" in Optum's pharmacy network.[14]   Pharmacies terminated from participation in Optum's pharmacy network are banned from the pharmacy network for five years and, only after such a period, may apply for reinstatement at Optum's "sole discretion."[15]

67.     The Defendants used the Optum platforms to create and implement their unlawful Overcharge Scheme.  Defendants exercised their discretion to program and manipulate the Optum technology and service platforms to violate the Plan's term and charge greater Cost-Sharing Amounts than the Plans permitted, and they exercised their discretion to input the excessive and unlawful cost-sharing data into the platform system to enable the system to overcharge patients.

68.     Defendants further used their discretion to manipulate the Optum systems to misrepresent "Cost-Sharing Amounts (e.g. Co-payment, Coinsurance and Deductible) applicable to Covered Prescription Services" that were inflated, false and in violation of the Plans. Defendants required the pharmacies to make these misrepresentations to Plaintiff and other patients when they filled their prescriptions.   For example, Defendants made these misrepresentations to Plaintiff each time she filled a prescription and was advised of and required to pay an excessive Copayment and Spread as alleged above.

69.     Defendants further exercised their discretion to direct that pharmacies "shall collect the full [inflated and unlawful] Cost-Sharing Amounts" from patients. [16]   Defendants required that pharmacies "must charge . . . the Cost-Sharing Amount indicated in [Optum's] online response and only this amount,"[17] which included the excessive and unlawful

---

[14] *Id.*

[15] *Id.* at 106.

[16] *Id.*

[17] *Id.* at 57.

- 21 -

Overcharges in violation of the Plans that Defendants exercised their discretion to improperly input into the Optum system.

70.     Alternatively, where the patient pays a deductible and/or coinsurance (not a copayment), the patient is overcharged because his or her payment is based on the inflated amount, *not* the lower amount that the Defendants and PBM pay to the pharmacy.  Defendants implemented the scheme concerning these types of cost-sharing in the same way they executed the scheme concerning copayments.

71.     Defendants' Overcharge Scheme includes various misrepresentations and omissions of material fact, including, but not limited to: (a) the misrepresentation in the Plans that Plaintiffs would pay a certain amount for prescription drugs with the knowledge and intent that patients would in fact be charged a higher amount; (b) the misrepresentation of the amount of the cost-sharing payment owed under the Plan terms when a patient purchased a drug; (c) the failure to disclose that a material portion of the "co-payments" were neither payments for prescription drugs nor were they "co-" payments, but rather were unlawful Overcharges; (d) the failure to disclose that prescription drug payments under deductible portions of health insurance Plans were based on prescription drug prices that exceeded the contracted fee between Optum and the pharmacies, as required by the Plans' plain language; and (e) the failure to disclose that co-insurance payments were based on prescription drug prices that exceeded the contracted fee between the Optum and the pharmacies, as required by the Plans' plain language.

72.     On information and belief, many pharmacists were willing participants in the foregoing scheme while they were allowed to retain the Spread.  However, once Defendants began "clawing back" the Spread (rather than allowing pharmacists to retain it), some pharmacists began attempting to alert customers to the existence of the Overcharges and Clawbacks.  Defendants

affirmatively blocked pharmacists from disclosing the existence of the Overcharges and Clawback scheme and from selling prescription drugs directly to customers for a lower price.

73.     For example, according to Doug Hoey ("Hoey") of the National Community Pharmacists Association ("NCPA"), a pharmacist sent him a letter received from Optum.  Hoey stated that the letter from "Optum scolded the pharmacist," stating that Optum had '"recently discovered that pharmacy advised members that utilizing a cash price for their prescription is a better deal than using their insurance benefits.'"[18]  Optum further stated in the letter that "telling customers a cheaper price exists is a 'violation of the agreement,' [with Optum]," that Optum 'takes these matters very seriously[,]' and that 'failure to timely comply with this notice could result in further disciplinary action, up to and including termination from all Optum pharmacy networks.'"  *Id.*

74.     Indeed, a June 28, 2016 press release issued by the NCPA described the "Clawback" practice and how it was impacting pharmacists and consumers throughout the United States.[19]  The press release went on to discuss a survey that was conducted by the NCPA of its members between June 2 and June 17, 2016, which disclosed the following:

• "Clawbacks" are relatively common, as 83 percent of pharmacists witnessed them at least 10 times during the past month.

• Two-thirds (67 percent) said the practice is limited to certain PBMs.

---

[18] *See* Lee Zurik, *As United overcharges customers, execs earn tens of millions in stock*, FOX8LIVE.COM (July 18, 2016, 11:10 PM), http://www.fox8live.com/story/32472327/zurikasunitedoverchargescustomersexecsearntensofmillionsinstock (last visited Jan. 9, 2017).

[19] News Releases, NCPA, Pharmacists Survey: Prescription Drug Costs Skewed by Fees on Pharmacies, Patients (June 28, 2016), http://www.ncpanet.org/newsroom/news-releases/2016/06/28/pharmacists-survey-prescription-drug-costs-skewed-by-fees-on-pharmacies-patients (last visited Jan. 9, 2017); *see also Survey of Community Pharmacies*, NCPA (2016), http://www.ncpa.co/pdf/dir_fee_pharamcy_survey_june_2016.pdf (last visited Jan. 9, 2017).

- Most (59 percent) said they believe the practice occurs in Medicare Part D plans as well as commercial ones.

- Sometimes PBM corporations impose "gag clauses" that prohibit community pharmacists from volunteering the fact that a medication may be less expensive if purchased at the "cash price" rather than through the insurance plan.  In other words, the patient has to affirmatively ask about pricing.  Most pharmacists (59 percent) said they encountered these restrictions at least 10 times during the past month.[20]

75.     Some of the comments received from the pharmacists who responded to the survey included:

"Got one today. [PBM] charging a patient $125 for a generic drug and take back $65 from the pharmacy. If paid cash the cost to the patient would have been $55."

\*\*\*

"Simvastatin 90-day charged the patient $30 more than cash price."

\*\*\*

"[A] patient copay is over $50 and the claw back is over $30 all for a drug while our cash price would only be $15."

\*\*\*

"The ones that make me the most upset is the Champ/VA claims. Seeing our disabled veterans families paying more than they should is horrific. Many times these fees are multiple times our net margin, even a negative reimbursement at times. One recent copay of $30 while we sent $27.55 back to [PLAN] left our margin at $1.58."

\*\*\*

"Same patient, same day, five prescriptions. … Total copay $146.89. Total claw back $134.49. Total price of the five prescriptions $12.40. Our gross profit on these five drugs $3.79. These are all maintenance medications for this patient."

\*\*\*

---

[20]     *Id.*

"Recently filled a buproprion xl 150 script for 30 tabs. Cost is $17.15. PBM required us to charge a patient $47.10 and then took back $35."[21]

76.     Clearly, these examples of Overcharges could not be possible if the true cost of the prescription drug was disclosed and the pharmacy was not prohibited by contract and threat of network termination from disclosing the lower cash-paying price for these drugs.

77.     Clawback programs are becoming more and more commonplace in the insurance industry and have "the effect of duping average consumers of prescription drugs into unwittingly funding [corporate] profits." [22]

78.     Lawmakers, PBM customers, and pharmacists have all raised concerns that there is a dangerous lack of transparency with respect to the revenue stream of PBMs, rendering it difficult to assess whether an insurance policy or plan is being administered in compliance with plan or contract terms.[23]

79.     Potential waste and abuse in the administration of these plans has not gone unnoticed by the Department of Labor—which has the authority to enforce ERISA.  As early as 2014, the growing influence of PBMs generated a number of concerns not the least of which was the fact that PBMs engage in direct and confidential negotiations with drug manufacturers and

---

[21]     *See Community pharmacists describe PBM copay clawbacks on patients*, NCPA.CO (2016), http://www.ncpa.co/pdf/06-27-16-copay-clawbacks.pdf (last visited Jan. 9, 2017).

[22] Susan Hayes, Testimony Before the Employee Benefit Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans, U.S. Department of Labor, Hearing on PBM Compensation and Fee Disclosures (Aug. 20, 2014), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/AChayes082014.pdf.

[23] National Community Pharmacists Association, *Lawmakers Ask Medicare for More Drug Payment Transparency* (Oct. 22, 2015), http://www.ncpanet.org/newsroom/news-releases/2015/10/22/lawmakers-ask-medicare-for-more-drug-payment-transparency.

pharmacies like those described above and further below. In response, the ERISA Advisory

Council, established under ERISA, held a hearing in August 2014.

80.    At the hearing, the Council heard testimony regarding "a new PBM phenomenon,

called 'clawback'" which takes advantage of the lack of transparency in the PBM industry

According to testimony provided to the Council:

> In a "clawback" situation, the patient presents a prescription at a pharmacy.  The claim is
> processed and the pharmacist is instructed to collect $100 as the cost of the drug.  The
> entire prescription is paid for by the patient.  Two weeks later, when the pharmacist
> receives reimbursement from the PBM, his remittance statement shows that the PBM has
> taken back (clawed-back) $75. This leaves just enough so that the pharmacist may make
> a few dollars profit on the claim. What happens to the $75 difference? The PBM retains
> this amount as "spread" paid for by the patient.[24]

### The Fox 8 Investigation

81.    The New Orleans television station FOX 8 investigated "Clawbacks," as part of its

Medical Waste investigative series. FOX 8's investigative reporter, Lee Zurik, found that

insurance companies were "charging co-pays that exceed the customers' costs for the drug," and

that insurers were "clawing back" the excess payments from the customers.

82.    FOX 8 published a number of screenshots from a pharmacist's computer system

showing, with respect to particular drugs, the amount of the payment that certain health insurance

companies (including Defendants) required pharmacists to collect from customers and the amount

the pharmacists were required to pay to the health insurance companies as a "Clawback."

83.    As part of its investigation, Mr. Zurik requested comment from United, OHI's

parent.  Notwithstanding the specific provisions in the contract Defendants imposed on pharmacies

that barred pharmacists from disclosing the existence of the Spread to customers (as detailed

---

[24] Hayes, *supra* note 17 at 7.

above), the United representative falsely claimed that "we encourage people to ask questions of their pharmacists to ensure they are getting the lowest available price for their prescriptions:"

From: Burns, Matthew A <matt_burns@uhc.com>
Sent: Friday, July 22, 2016 8:46 PM
To: Zurik, Lee
Subject: RE: Part D story

Attribute to me:

Our goal is to help our members get the lowest available price for their prescriptions. Often the lowest price is their plan copay, other times it's our contracted rate with the pharmacy, and sometimes it's the pharmacy's own retail or discount price. Our plans offer members security and peace of mind, and we encourage people to ask questions of their pharmacists to ensure they are getting the lowest available price for their prescriptions.

84.     An Optum representative further explained to Mr. Zurik that "there is no new charge for the consumer as a result of" OHI's Clawback scheme, ignoring that the underlying Spread was itself illegal.

From:          Stearns, Matthew H <matt.stearns@optum.com>
Sent:          Thursday, May 05, 2016 8:51 PM
To:            Zurik, Lee
Subject:       RE: From Optum

Hey – last thing, to be clear: this program ensures the customer pays the lowest amount possible within their plan – there is no new charge for the consumer as a result of this program.

85.     The Optum representative also claimed that the Clawback "does not accrue to [Optum's] bottom line:"

From: Stearns, Matthew H [mailto:matt.stearns@optum.com]
Sent: Thursday, May 05, 2016 8:31 PM
To: Zurik, Lee <lzurik@fox8live.com>
Subject: RE: From Optum

Thanks, Lee. Key point here is that this does not accrue to our bottom line.

On information and belief, this statement was false.

86.     In response to the disclosure of the "Clawback" practice, Louisiana Insurance Commissioner, James J. Donelon stated: "You could say that, if the customer is paying more than the drug is worth, it's not a copay – it's a 'you-pay'.  'There's no copay,' our pharmacist says, 'that is an absolute, additional premium being paid, that they're paying, that they don't realize.'"

87.     FOX 8 also found that pharmacists were required to charge customers the amount dictated by the insurer or PBM, and were not allowed to give any discounts.  According to Randal Johnson, president and CEO of the Louisiana Independent Pharmacies Association, "it's actually costing you more to acquire the drug with your insurance than you could if you walked in off the street and you didn't have insurance."

### "Clawbacks" Are Most Common With Widely Used Drugs

88.     Defendants impose Overcharges and Clawbacks most frequently on widely used, low-cost drugs, and particularly generic drugs, where the cost of the drug is relatively low.  This enables Defendants to impose deductible costs, copayments, and coinsurance costs that are higher than the cost of the drug, thereby insuring for themselves a Clawback.  These drugs include, but are not limited to the following: Accu-Chek, Acyclovir, Aktob, Albuterol, Alocril, Alprazolam, Amiodarone, Amitriptyline, Amlodipine, Amoxicillin, Amphetamine, Anastrozole, Atenolol, Atorvastatin, Azelastine, Azithromycin, Bactrim, Benazepril, Benzonatate, Betamethasone, Buspirone, Bystolic, Carvedilol, Cefadroxil, Cefdinir, Cephalexin, Cetirizine, Ciprofloxacn, Citalopram, Clindamycin and Benzoyl Peroxide, Clindamycin, Clonazepam, Clonidine, Clopidogrel, Cyanocobalam, Cyclobenzaprine, Cytomel, Denta, Depo-Testosterone, Diazepam, Dicyclomine, Diltiazem, Doxazosin, Doxycycl, Duloxetine, Enalapril, Escitalopram, Estradiol, Eszopiclone, Feosol, Ferrous, Flonase, Fluconazole, Fluocinonide, Fluoxetine, Fluticasone, Folbee, Folic, Furosemide, Gabapentin, Gemfibrozil, Gentamicin, Gianvi, Glimepiride, Glipizide, Guaifenesin, Hydrochlorot, Hydrocodone/APAP, Hydroxyz, Ibuprofen, Indomethacin,

Invokamet, Irbesartan, Isosorbide, Januvia, Lamotrigine, Lantus, Latanoprost, Levetiraceta,
Levocetirizi, Levofloxacin, Levothyroxine, Lexapro, Lisinopril And Hydrochlorothiazide,
Lisinopril, Lisinopril/hydrochlorothiazide, Lithium, Loratadine, Lorazepam, Losartan, Losartan
and Hydrochlorothiazide, Lovastatin, Meloxicam, Memantine, Metformin, Methocarbam,
Methylphenidate, Metolazone, Metoprolol, Metronidazol, Minivelle, Mirtazapine, Mometasone,
Montelukast, Mupirocin, Naproxen, Nitrofurantoin, Nortriptylin, Nystatin, Omeprazole,
Ondansetron, Oxcarbazepin, Oxybutynin, Oxycodone/APAP, Pantoprazole, Paroxetine,
Penicillin, Percocet, Pramipexole, Pravastatin, Prednisone, Prednisolone, Promethazine/Codeine,
Ramipril, Ranitidine, Restasis, Sertraline, Simvastatin, Singulair, SMZ/TMP, Sodium Chloride (1
gm), Spironolactone, Sprintec, Sulfameth/Trimeth, Sumatriptan, Suprep, Synthroid, Tamiflu,
Tamsulosin, Temazepam, Terazosin, Terbinafine, Tizanidine, Tobramycin/Sus Dexameth,
Topiramate, Tramadol, Tranex, Trazodone, Tretinoin, Triamcinolone, Triamterene and
Hydrochlorothiazide, Vagifem, Valacyclovir, Valsartan/hydrochlorothiazide, Valsartan, Vaniqa,
Venlafaxine, Ventolin, Viagra, Vigamox, Vitamin D, Vyvanse, Warfarin, Xopenex, Zaleplon, and
Zolpidem.

**Defendants Are Fiduciaries and Parties In Interest**

89.     Plaintiff and the members of the ERISA Subclass (as defined below) are
participants in employee welfare benefit plans as that term is defined in 29 U.S.C. § 1002(1)(A),
insured or administered by Defendants to provide participants with medical care and prescription
medications ("ERISA Plans").

90.     ERISA requires every plan to provide for one or more named fiduciaries who will
have "authority to control and manage the operation and administration of the plan."  ERISA §
402(a)(1), 29 U.S.C. § 1102(a)(1).

91.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  This is a functional test.  Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

92.     In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA Plans and their participants. The power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power. An appointing fiduciary must take prudent and reasonable action to determine whether the appointees are fulfilling their own separate fiduciary obligations.

93.     Defendants are fiduciaries of all of the ERISA Subclass members' ERISA Plans to which they provided prescription drug benefits or for which they administered prescription drug benefits in that they *exercised* discretionary authority or control respecting the plan management activities, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), and in that they *had* discretionary authority or discretionary responsibility in the administration of the ERISA Plans of participants and beneficiaries in the ERISA Subclass, ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii).

94.     Defendants **had** fiduciary authority under the Plans in that they operated the prescription drug benefits under the Plans as alleged herein.  For example, Plaintiff Mohr-Lercara's 2011-2013 Plan states:

**Prudent Actions by Plan Fiduciaries**

➔   In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.  The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.  No one, including your employer, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

95.     Defendants are also fiduciaries because they **exercised** fiduciary authority.  By way of example, they:

(a)     exercised discretion to violate the Plans and charge patients Overcharges, including Spread;

(b)     exercised discretion to set up a computer system and input data into that system to enable them to charge patients Overcharges, including Spread, and set the excessive amounts pharmacies charged patients for prescription drugs;

(c)     exercised discretion to require pharmacies to charge and collect the Overcharges, including Spread;

(d)     exercised discretion to require pharmacies to misrepresent to patients the proper cost-sharing payments and prevent pharmacies from disclosing to patients the proper cost-sharing amounts and the manner in which they charged for prescription drugs as alleged above;

(e)     exercised discretion to prohibit pharmacies from disclosing to patients the existence or amount of the Overcharges, including Spread and Clawbacks; and

- 31 -

(f)     exercised discretion to prohibit pharmacies from disclosing to patients that they could purchase drugs at a price lower than the amount set by Defendants by not using their insurance or prescription benefits.

96.     The Clawbacks were additional compensation for and profits from the provision of prescription drug coverage that was collected by Defendants that was neither disclosed to nor agreed to. Defendants are also fiduciaries because they exercised and had discretion to determine the amount of and require the payment of this additional undisclosed compensation, and whether to disclose it—or require its concealment, in violation of the Plans and their fiduciary duties. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

97.     The Clawbacks were additional premium for the provision of prescription drug coverage that was collected by Defendants that was neither disclosed to nor agreed to by the participants and beneficiaries that were required to make these additional contributions to receive their covered prescription drugs. Defendants are also fiduciaries because they exercised discretion to determine the amount of and require the payment of this additional undisclosed premium payment, and whether to disclose it—or require its concealment, in violation of the Plans and their fiduciary duties. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

98.     In addition to their fiduciary status under the foregoing provisions, Defendants are fiduciaries in that they *exercised* authority or control respecting management or disposition of plan assets, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), because:

(a)     the copayments, coinsurance, and deductible payments Defendants required pharmacies to collect from participants and beneficiaries are "plan assets" within the meaning of ERISA;

(b)     the insurance and ASO contracts underpinning the Plans are "plan assets" within the meaning of ERISA;

(c)     the payments from employers and related trusts for self-insured plans are "plan assets" within the meaning of ERISA; and

(d)     through their Clawback Scheme, Defendants exercised control over (i) drug payments from participants and beneficiaries; (ii) the contracts underpinning the ERISA Plans; and (iii) the payments from employers in self-insured plans, in that they successfully leveraged their relationships to the ERISA Subclass members' Plans to benefit themselves, their affiliates, and third parties, and their *authority or control* over these significant plan assets enabled them to do so.

99.     In addition, OHI was a fiduciary by retaining and delegating to Optum some of OHI's fiduciary duty to provide prescription drug services for the benefit of the ERISA Subclass. When OHI endowed Optum with authority and discretion to control prescription charges to be paid by the ERISA Subclass, OHI assumed the duty to monitor Optum's exercise of that discretionary authority. OHI further owed and owes the ERISA Subclass the duty to establish policies and procedures to monitor Optum's performance of its duties, to monitor its prescription medication pricing, to monitor the effect of the Overcharge and Clawback Scheme described herein on the amount paid by the ERISA Subclass, to protect the interests of the ERISA Subclass, to avoid the misuse of plan assets, and to provide complete and accurate information to the ERISA Subclass.

100.     Defendants are also parties in interest under ERISA because (a) they are fiduciaries, ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and/or (b) they provided insurance, plan

administration, and pharmacy benefit management services to Plaintiff's and the Subclass members' health plans, ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

101.    As parties in interest, Defendants received direct and indirect compensation for services, some of which was in the form of excess Clawback fees that were collected in exchange for few to no services. Defendants also received and used for their own and their affiliates' benefit "plan assets," including patient payments and ERISA Plan contracts under which they had access to the ERISA Plans and were able to impose their Clawback Scheme on the ERISA Subclass.

102.    Finally, even if any Defendant is found not to be a fiduciary, that Defendant is alternatively subject to equitable relief under ERISA, because it had actual or constructive knowledge of the ERISA violations through its role in the Clawback Scheme.

### Defendants' ERISA Duties

103.    **The Statutory Requirements:** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

104.    **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty— that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan

with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

105.    **The Duty of Prudence.**  Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence—that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

106.    **The Duty to Inform.**  The duties of loyalty and prudence include the duty to disclose and inform.  These duties entail:  (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

107.    **Prohibited Transactions.**  ERISA's prohibited transaction rules bar fiduciaries from certain acts because they are self-interested or conflicted and therefore become per se violations of ERISA § 406(b)—or because they are improper "party in interest" transactions under ERISA § 406(a).  As noted above, under ERISA, a "party in interest" includes a fiduciary, as well as entities providing any "services" to a plan, among others. *See* ERISA § 3(14), 29 U.S.C. § 1002(14). ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty, which are discussed above.

108.    ERISA § 406(a) provides that transactions between a plan and a party in interest are prohibited transactions unless they are exempted under ERISA § 408:

      (a)  Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;
(B) lending of money or other extension of credit between the plan and a party in interest;
(C) furnishing of goods, services, or facilities between the plan and a party in interest;
(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a).

109.   ERISA § 406(b), provides:

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,
(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

110.   **Co-Fiduciary Liability.**  A fiduciary is liable not only for fiduciary breaches within the sphere of its own responsibility, but also as a co-fiduciary in certain circumstances.  ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)  if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

- 36 -

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

111.    **The Duty to Monitor.**  In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries.  As noted above, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

112.    **Non-Fiduciary Liability.**  Under ERISA, non-fiduciaries—regardless of whether they are parties in interest—who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  Accordingly, as to the ERISA claims, even if any Defendant is not found to have fiduciary or party-in-interest status themselves, they must nevertheless restore unjust profits or fees and are subject to other appropriate equitable relief with regard to the transactions at issue in this action, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and well established case law. To the extent that any Defendant is not deemed to be a fiduciary or a party-in-interest with regard to any transaction at issue in this action, they are nevertheless subject to equitable relief under ERISA based on their actual or constructive knowledge of the wrongdoing at issue.

113.    **Rights of Action Under the Plans, for Fiduciary Breach, Prohibited Transactions, and Related Claims.**  ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan.  Further, ERISA § 502(a)(3),

- 37 -

29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  The remedies available pursuant to § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and for violation of the prohibited transaction rules set forth in ERISA § 406, 29 U.S.C. § 1106. Further, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409. ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets.  ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate. Plaintiffs bring their ERISA claims pursuant to ERISA § 502(a)(3) and (2), as well as § 502(a)(1)(B), as further set forth below, because not all the remedies Plaintiffs seek are available under all sections of ERISA and, alternatively, Plaintiffs are pleading their claims in the alternative.

## Defendants Breached Their Duties

114.    Defendants breached the terms of the ERISA Plans, committed breaches of fiduciary duty, engaged in prohibited transactions, and harmed Plaintiff and ERISA Subclass members in the following ways:

(a)    Defendants wrongfully charged Plaintiff and ERISA Subclass members Overcharges, including Spread;

(b)      Defendants wrongfully charged Plaintiff and ERISA Subclass members excessive and unlawful coinsurance payments in that rather than charging a percentage of the fees that Defendants paid the pharmacies for the dispensed drugs, the coinsurance payments were based on substantially inflated amounts;

(c)      Defendants wrongfully charged Plaintiff and ERISA Subclass members excessive deductible payments in that rather than charging the lesser of the applicable per occurrence deductible fee or the fee paid to the pharmacy for the dispensed drug, Plaintiff and ERISA Subclass members were charged deductible fees that were higher;

(d)      Defendant wrongfully set up a computer system and input data into that system to enable them to charge patients Overcharges, including Spread, and dictate the excessive amount pharmacies charged patients for prescription drugs;

(e)      Defendants wrongfully required pharmacies to charge patients Overcharges, including Spread;

(f)      Defendants wrongfully required pharmacies to collect the Overcharges, including Spread and pay that back to Defendants as Clawbacks;

(g)      Defendants wrongfully misrepresented to patients the proper cost-sharing amounts in both the Plan terms and when patients filled their prescriptions and were charged by pharmacies;

(h)      Defendants willfully failed to disclose to patients the proper cost-sharing amounts and the manner in which they charged for prescription drugs;

(i)      Defendants wrongfully prohibited pharmacies from disclosing to patients the existence or amount of the Overcharges, including Spread, and Clawbacks;

(j)     Defendants wrongfully prohibited pharmacies from disclosing to patients that they could purchase drugs at a price lower than the amount set by Defendants;

(k)     Defendants wrongfully determined the amount of and collected additional unlawful undisclosed compensation in violation of the Plans.;

(l)     Defendants wrongfully determined the amount of and collected additional unlawful undisclosed premium payment in violation of the Plans.;

(m)     Defendants set, changed, and collected their own compensation for services performed as fiduciaries by collecting Clawbacks;

(n)     Defendants failed to stop injuries to plan participants caused by their co-fiduciaries and service providers; and

(o)     Defendants failed to monitor their appointees, formal delegees, and informal designees in the performance of their fiduciary duties.

115.    Defendant OHI breached its fiduciary duties under ERISA by retaining Optum to provide PBM services for the benefit of the ERISA Subclass, but failing to take reasonable and prudent action to determine whether and ensure that Optum was fulfilling its own separate fiduciary obligations. OHI breached its duty to establish policies and procedures to monitor Optum's performance of its duties, to monitor its prescription drug pricing, to monitor the effect of the Overcharges and Clawback Scheme described herein on the amount paid by the ERISA Subclass, to protect the interests of the ERISA Subclass, and to provide complete and accurate information to the ERISA Subclass.

## CLASS ACTION ALLEGATIONS

116.    Plaintiff brings this action as a class action pursuant to Rule 23(b)(1), (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the Class and the ERISA Subclass defined as follows:

> **The Class.**  All individuals residing in the United States and its territories who are enrolled in a health benefit plan issued and/or administered by OHI or insured by OHI, who purchased prescription drugs pursuant to such plan and paid an amount for such drugs that was higher than the payment amount provided by the plan.

117.    Within the Class there is one subclass:

> **ERISA Subclass**.  All participants or beneficiaries who are enrolled in a health benefit plan issued and/or administered by OHI or insured by OHI and subject to ERISA, who purchased prescription drugs pursuant to such plan and paid an amount for such drugs that was higher than the payment amount provided by the plan.

118.    Plaintiff reserves the right to redefine the Class prior to certification.

119.    **Class Period.**  Plaintiff will seek class certification, losses, and other available relief for fiduciary breaches and prohibited transactions occurring within the entire period allowable under ERISA § 413, 29 U.S.C. § 1113, including its fraud or concealment tolling provisions, as well as under RICO, 18 U.S.C. 1961, *et seq*. and the doctrine of equitable tolling. Further, Plaintiff reserves the right to refine the Class Period after they have learned the extent of Defendants' fraud, the length of its concealment, and the time period during which "Clawbacks" were taking place.

120.    Excluded from the Class are Defendants, any of their parent companies, subsidiaries, and/or affiliates, their officers, directors, legal representatives, and employees, any co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

121.     This action is brought, and may properly be maintained, as a Class action pursuant to Fed. R. Civ. P. 23.  This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

122.     The Class and Subclass are so numerous that the individual joinder of all of its members is impracticable.  Due to the nature of the trade and commerce involved, Plaintiff believes that the total number of Class and Subclass members is in the thousands and that the members of the Class and Subclass are geographically dispersed across the United States.  While the exact number and identities of the Class and Subclass members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.

123.     Plaintiff's claims are typical of the claims of the members of the Class and Subclass because Plaintiff's claims, and the claims of all Class and SubClass members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class and Subclass are similarly affected by Defendant's wrongful conduct.

124.     There are questions of law and fact common to the Class and Subclass and these questions predominate over questions affecting only individual Class and SubClass members.  Common legal and factual questions include, but are not limited to:

(a)     Whether Defendants are fiduciaries under ERISA;

(b)     Whether Defendants are parties in interest under ERISA;

(c)     Whether Defendants breached their fiduciary duties in failing to comply with ERISA as set forth above;

(d)     Whether Defendants acts as alleged above breached ERISA's prohibited transaction rules;

- 42 -

(e)     Whether Defendants knowingly participated in and/or knew or had constructive knowledge of violations of ERISA, including breaches of fiduciary duty;

(f)     Whether Defendants conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity;

(g)     Whether Defendants conspired to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity;

(h)     Whether such racketeering consisted of acts that are indictable pursuant to 18 U.S.C §§ 1341 and 1343;

(i)     Whether Defendants engaged in a scheme to defraud;

(j)     Whether each Defendant was a knowing and active participant;

(k)     Whether the mail, interstate carriers or wire transmissions were used in connection with such scheme to defraud;

(l)     Whether Plaintiff and Class and Subclass members were injured in their property or business as a direct and proximate result of Defendants' racketeering activities;

(m)     Whether Defendants violated the Plans' terms by authorizing or permitting pharmacies to collect and then remit Overcharges, including Spread amounts to them and thereby overcharged subscribers for prescription drugs;

(n)     Whether the members of the Class and/or Subclass have sustained losses and/or damages and/or Defendants have been unjustly enriched, and the proper measure of such losses, and/or damages, and/or unjust enrichment; and

(o)     Whether the members of the Class and/or Subclass are entitled to declaratory and/or injunctive relief.

125.    Plaintiff will fairly and adequately represent the Class and Subclass and has retained counsel experienced and competent in the prosecution of class action litigation.  Plaintiff has no interests antagonistic to those of other members of the Class and Subclass.  Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

126.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class and/or Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class and/or Subclass to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

127.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

128.    Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

129.    Class action status in this action is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class and Subclass, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to each Class and Subclass as a whole.

130.     Class action status in this action is warranted under Rule 23(b)(3) because questions of law or fact common to members of the Class and Subclass predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.  Joinder of all members of the Class is impracticable.

## EXHAUSTION IS NOT REQUIRED

### Administrative Remedies or Claims Procedures Are Deemed Exhausted, Do Not Apply and/or Would be Futile

131.     The doctrine of exhaustion of administrative remedies does not apply to Plaintiff's claims for four reasons. First, the doctrine could only apply to the claims alleged in Count I under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). No other claims in this case are subject to the exhaustion defense, particularly on a motion to dismiss. *See Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 89-90 (2d Cir. 2001).

132.     Second, Defendants cannot meet their burden of proving that Plaintiff was required to pursue administrative remedies prior to bringing this case under the terms of the Plans.

133.     Third, Defendants cannot meet their burden of proving that they have met all of the preconditions to asserting the exhaustion defense and, in particular, cannot meet their burden of proving compliance with the Regulation governing reasonable claims procedures. To the contrary, since Defendants have not complied with the Regulation, Plaintiff's claims are deemed exhausted as a matter of law.

134.     Finally, exhaustion would be futile.

### Administrative Remedies Do Not Apply

135.     The Plans' administrative remedies do not apply to the Overcharge claims asserted in this case. Once the pharmacy collected the cost-sharing payments and dispensed the drugs, the

pharmacy had been paid in full. When that occurred, Plaintiff had received her prescriptions and had received her benefits in full. Accordingly, this case does not concern a denial of benefits. It concerns an unlawful Overcharge.

136.    Plaintiff's 2011-2013 Plan states that "the cost of Medically Necessary Prescription Drug Products will be Covered …."  "Cover" means the "Medically Necessary Services paid for or arranged for [Plaintiff] by [Defendants] under the terms and conditions of the [Plan]." Accordingly, the Plan benefit is the payment of prescription drug costs subject to the cost-sharing provisions of the Plan.

137.    The 2014 Plan similarly provides "[Defendants] Cover Medically Necessary Outpatient Prescription Drugs …." The 2014 Plan has the same definition of "cover" as the 2011-2013 Plan.  Accordingly, the 2014 Plan benefit is also payment of prescription drug costs.

138.    The 2011-2013 Plan expressly states the procedure for obtaining prescription drug coverage benefits:

> **4.  If You Receive a Bill From a Network Provider**
>
> The cost of Covered Services provided by Network Providers in accordance with the terms of this Certificate will be billed directly to Us.  **No claim forms are necessary.**
>
> If you should receive a bill from a Network Provider for Covered Services, please contact the Customer Care Department immediately.

139.    The 2014 Plan contains a similar procedure for obtaining prescription drug coverage benefits.

> **Claims.** A claim is a request that benefits or services be provided or paid according to the terms of this Certificate. When You receive services from a Participating Provider you will not need to submit a claim form.  However, if You receive services from a Non-Participating Provider either You or the Provider must file a claim form with Us.  If the Non-Participating Provider is not willing to file the claim form, You will need to file it with Us.

140.    Plaintiff followed this procedure in obtaining her prescription drug benefits. Plaintiff submitted scripts to the in-network pharmacy. The pharmacy electronically transmitted the prescription benefit requests to Defendants. Defendants exercised their discretion to (1) make coverage decisions, (2) authorize the pharmacies to dispense the drugs, (3) instruct the pharmacies as to the amount of the cost-sharing payments, (4) instruct the pharmacies to represent the cost-sharing payments to Plaintiff, and (5) instruct the pharmacies to collect those payments from Plaintiff. The pharmacies then represented the cost-sharing amounts to Plaintiff and collected the payments and dispensed the drugs to the Plaintiff. At this point, the benefits process was complete as Plaintiff had received the drugs and the pharmacies had been paid in full.  Plaintiff accordingly received the entirety of her prescription drug benefits. Therefore, her claim is to recover the Overcharge, not to recover benefits.

141.    Defendants cannot meet their burden of establishing as a matter of law that the Plans include a mandatory pre-suit exhaustion requirement for Overcharge claims like the claims alleged here. *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 179 (2d Cir. 2013).

142.    Plaintiff's 2014 Plan provides:

> 24.   **Time to Sue.**   No action at law or in equity may be maintained against Us prior to the expiration of 60 days after written submission of a claim has been furnished to Us as required in this Certificate. You must start any lawsuit against Us under this Certificate within 3 years from the date the claim was required to be filed.

143.    Here, the claim was submitted in writing when the pharmacy electronically submitted the claim to Defendants, which was more than sixty days ago. Accordingly, the only pre-suit requirement was met concerning this Plan.

144.    Plaintiff's 2011-2013 Plan provides:

> **16.  Legal Action.**  No action at law or in equity may be maintained against Us for any expense or bill unless brought within the statute of limitations for such cause of action.

Since the statute of limitations either has not expired or has been tolled, as alleged below, this provision does not provide for a mandatory pre-suit exhaustion requirement.

145.    Moreover, the Grievance and Appeal Procedure under the 2011-2013 Plan is limited solely to Adverse Determinations and does not apply to the Overcharge claims asserted here.

> The Grievance and Appeal procedure is a procedure to be used after you have received an initial Adverse Determination concerning a claim for benefits or an administrative issue. Benefit issues include, but are not limited to: denials based on benefit exclusions or limitations and claims payment disputes.  Administrative issues concern other requirements of your health plan.  Administrative issues would include issues such as access to providers, eligibility or enrollment issues.

146.    An Adverse Determination is:

> **Adverse Determination -** Our determination that an admission, extension of stay, or other Health Care Service, is not Medically Necessary based on a review of the information provided.  Additionally, an Adverse Determination will be rendered if We do not receive a response to Our request for information necessary to review your case.

147.    Since this case does not concern whether healthcare is "Medically Necessary" or any "request for information," and does not concern an initial "Adverse Determination," the Grievance and Appeal Procedure does not apply.

148.    For each of these reasons, the Plans do not contain any mandatory pre-suit administrative procedures.

**Plaintiff's Claims Are Deemed Exhausted**

149.    In order to prevail on an exhaustion defense, Defendants must meet their burden of proving that they complied with the DOL Regulation governing claim procedures. This Regulation provides that every Plan must "establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations." C.F.R.   § 2560-503-1 (b). To take advantage of an exhaustion defense, Defendants have the burden of proving full compliance with this Regulation. *Halo v. Yale Health Plan, Director of Benefits & Records Yale University*, 819 F.3d 42, 56-58 (2nd Cir. 2016). If Defendants fail to meet their burden of proof, Plaintiffs are "deemed to have exhausted the administrative remedies under the Plans and shall be entitled to pursue any available remedies under section 502 (a)" of ERISA. 29 C.F.R.   § 2560-503-1 (l)(1).

150.    Defendants did not create and maintain reasonable claim procedures. For example, in response to the claim for prescription drug benefits filed by the pharmacy for the benefit of Plaintiff as required by the Plans, Defendants failed to provide any, much less detailed, notice that the Regulation requires, including the specific reason for the Overcharge, reference to the plan provisions on which the determination was based, a description of the review procedures and the rules relied upon in making the determination. 29 C.F.R.   § 2560-503-1 (g).  To the contrary, the most Plaintiff received was a piece of paper stapled to a pharmacy bag that stated only the amount of the Overcharge (but concealed the fact that there was an Overcharge). That "notice" does not meet any of the requirements of the Regulation and it renders the exhaustion defense invalid.

151.    Moreover, through the Optum Provider Manual gag clauses, Defendants intentionally and fraudulently blocked the pharmacy from disclosing the Overcharges to Plaintiff. Although the pharmacy had the amount of the Overcharges on its computer screen at the time

Plaintiff submitted her prescriptions to be filled, the gag clauses prohibited the pharmacy from disclosing this important information to Plaintiff. By blocking disclosure of the Overcharges, Defendants' procedures unduly inhibited and hampered the initiation of claims in violation of 29 C.F.R. § 2560-503-1 (b)(3) and are unreasonable as a matter of law.

152.   For these reasons, Plaintiff is "deemed to have exhausted the administrative remedies under the Plan and shall be entitled to pursue any available remedies under section 502 (a)" of ERISA. 29 C.F.R. § 2560-503-1 (l)(1).

**Administrative appeals would be futile.**

153.   Defendants' pervasive fraudulent Overcharge and Clawback scheme is a long-standing policy, broadly and systematically applied to all patients, regardless of their personal circumstances or locations.

154.   Defendants deliberately attempted to conceal their Overcharge and Clawback scheme through the "gag clauses," ensuring it would be difficult if not impossible for Plaintiffs to be aware or quantify the overcharges, thereby effectively thwarting a potential claimant from pursuing an administrative claim.

155.   Moreover, the notion that Defendants would disclose their massive fraudulent Overcharge and Clawback scheme in response to an administrative claim by a single patient is not remotely credible. Indeed, as discussed above, when questioned by a reporter on the propriety of the Overcharges and Clawbacks, Defendants publically "doubled down" on the propriety of the charges.

156.   And, assuming Defendants did disclose the scheme to those patients who complained, correcting the prices paid by patients on an individualized basis would inevitably result in unfair, disparate, and discriminatory treatment among Subclass members who, despite the

barriers Defendants have put in place, are able to obtain reimbursement for the overcharges, and those who have not or cannot.  A far more equitable, efficient and effective way to adjudicate overpayments made by the Subclass is for Defendants to disgorge in full these amounts pursuant to their own records that can track such payments for everyone in the Subclass.

**Plaintiff and the Class Are Entitled to Tolling Due to Fraud or Concealment**

157.   By its nature, Defendants' Overcharge and Clawback Scheme has hidden Defendants' unlawful conduct from injured parties.

158.   Neither Plaintiff nor Class members knew of the Overcharge and Clawback Scheme, nor could they have reasonably discovered the existence of the Overcharge and Clawback Scheme, until shortly before filing this action.

159.   Until recent news broke about Defendants' Overcharge and Clawback Scheme, their unlawful conduct was hidden from Plaintiff and the Class.

160.   Even today, the gag clauses in place between Defendants and providers continue to hide Defendants' unlawful conduct from members of the Class.

161.   To the extent that any of the causes of action alleged *infra* are subject to a specific statute of limitations, Defendants' fraud or concealment alleged herein *tolls* those requirements, for a specific amount of time to be determined as the litigation progresses.

162.   Further, ERISA's statute of limitations for fiduciary breach claims, ERISA § 413, 29 U.S.C. § 1113, provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation."

163.   While the RICO statute does not contain an express limitation period, the United States Supreme Court has held that civil RICO claims must be brought within four years from the

discovery of an injury, which limitation is subject to equitable tolling due to defendants' fraudulent concealment of their unlawful conduct. *Rotella v. Wood*, 528 U.S. 549 (2000).

164.   The Overcharge and Clawback Scheme—by its nature a secret endeavor by Defendants—remains hidden from most members of the Class. Moreover, during the Class Period, as defined above, each Defendant actively and effectively concealed its participation in the Overcharge and Clawback Scheme from Plaintiffs and other members of the Class and Subclass through "gag clauses" and secrecy policies. There is no question that Plaintiffs' claims are timely.

## COUNT I

### For Violations of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) Against All Defendants on Behalf of the ERISA Subclass

165.   Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

166.   ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify her rights to future benefits under the terms of the plan.

167.   As set forth above, as a result of being overcharged for prescription drugs, Plaintiff and the ERISA Subclass have been and likely will continue to be denied their rights under the Plans to be charged a lower amount for their prescriptions.

168.   Plaintiff and the ERISA Subclass have been damaged in the amount of the Overcharges, including Spread. Plaintiff and the ERISA Subclass are entitled to recover the amounts they have been overcharged.

169.   Plaintiff and the ERISA Subclass are entitled to enforce their rights under the terms of the plans and seek clarification of their future rights and are entitled to an order providing, among other things:

(a)     That they have been overcharged;

(b)     For an accounting of Defendants' charges and overcharges;

(c)     For payment of all amounts due them in accordance with their rights under the ERISA Plans; and

(d)     For an order that they are entitled in the future not to pay Overcharges or any other additional amounts that conflict with their rights under the ERISA Plans.

## COUNT II

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### for Violations of ERISA § 406(a)(1)(C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D)
### Against All Defendants on Behalf of the ERISA Subclass

170.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

171.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the payment of direct or indirect compensation in the furnishing of services by a party in interest to a plan.

172.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

173.    As alleged above, Defendants are fiduciaries of the ERISA Plans of the participants and beneficiaries in the ERISA Subclass.  Defendants are also parties in interest under ERISA in that they are fiduciaries and/or they provided prescription drug insurance and/or administrative "services" to ERISA SubClass members pursuant to the ERISA Plans.  ERISA § 3(14)(A) & (B),

29 U.S.C. § 1002(14)(A) & (B).  Thus they were engaged on one or both sides of these § 406(a) prohibited transactions.

174.    As fiduciaries, Defendants caused the ERISA Plans to engage in prohibited transactions as alleged herein.

175.    As parties in interest, Defendants received direct and indirect compensation in the form of undisclosed compensation, including Clawbacks, in exchange for the services they provided to Plaintiff and the ERISA Subclass pursuant to their prescription drug Plans.  ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

176.    The only exception to the prohibition of such compensation is if it was for services necessary for the operation of a plan and such compensation was reasonable.  ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

177.    While the burden is on Defendants to invoke and establish this exception, the compensation paid to Defendants was not reasonable under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) in that the compensation was excessive and/or unreasonable in relation to the value of the services provided.  Defendants' compensation exceeded the premiums and other fees that were agreed upon for fully providing prescription drug benefits.  Further, Defendants as fiduciaries of the ERISA Plans are entitled to receive at most reimbursement for their direct expenses.

178.    Defendants also received transfers of plan assets in that they received excess copayments, coinsurance, or deductible payments and Plan contributions through Clawbacks.  ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

179.    In addition and in the alternative, Defendants used—and misused—assets of the ERISA Plans by leveraging the contracts underpinning these ERISA Plans to gain access to patients who needed prescription drugs and would be required to pay copayments, coinsurance, or

deductible payments which Defendants could appropriate in their Overcharge and Clawback Scheme. Further, Defendants used—and misused—for their own benefit and the benefit of other parties in interest additional assets of the ERISA Plans—the contracts underpinning the ERISA Plans of members of the ERISA Subclass—to effectuate their Overcharge and Clawback Scheme. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

180.    Plaintiff and the ERISA Subclass have suffered losses and/or damages and/or Defendants have been unjustly enriched in the amount of the compensation Defendants took for themselves.

181.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

182.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class, including but not limited to:

(a)    an accounting;

(b)    a surcharge;

(c)    correction of the transactions;

(d)    disgorgement of profits;

(e)    an equitable lien;

(f)    a constructive trust;

(g)    restitution;

(h)    full disclosure of the foregoing acts and practices;

(i)    an injunction against further violations; and/or

(j)     any other remedy the Court deems proper.

## COUNT III

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 406(b), 29 U.S.C. § 1106(b)**
**Against All Defendants on Behalf of the ERISA Subclass**

183.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

184.    ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not (1) deal with plan assets in its own interest or for its own account, (2) act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or (3) receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

185.    As alleged above, Defendants are fiduciaries to the ERISA Plans. They violated all three subsections of ERISA § 406(b).

186.    As alleged above, both (i) cost-sharing payments from participants and beneficiaries (ii) the contracts underpinning the ERISA SubClass members' ERISA Plans and (iii) Plan contributions are plan assets under ERISA.

187.    First, by setting their own compensation from cost-sharing payments from participants and beneficiaries, collecting their own compensation from that same source, and managing contracts in their own interest or for their own account, Defendants violated ERISA § 406(b)(1).  Specifically, in setting the amount of and taking excessive undisclosed compensation, including Clawbacks, Defendants received plan assets and consideration for their personal accounts.

188.    Second, by acting on behalf of each other and on behalf of non-parties who also stood to profit from Clawbacks at the expense of Plaintiff and members of the ERISA Subclass—

- 56 -

and thus with interests adverse to the affected participants and beneficiaries—Defendants engaged in conflicted transactions each time they facilitated, required, or allowed Clawbacks, through service provider contracts or in transactions at the pharmacy counter, in violation of ERISA § 406(b)(2).  Under this subsection of ERISA § 406(b), plan assets need not be involved—dealing with a plan is enough.

189.    Third, through their Overcharge and Clawback Scheme, Defendants received consideration for their own personal accounts from other parties—including each other, third parties, and the members of the ERISA Subclass—that were dealing with the ERISA Plans in connection with a transaction involving the assets of the ERISA Plans.

190.    Plaintiff and the ERISA Subclass have been damaged and suffered losses in the amount of the excessive compensation Defendants took through these prohibited transactions.

191.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

192.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the ERISA Subclass, including but not limited to:

   (a)    an accounting;

   (b)    a surcharge;

   (c)    correction of the transactions;

   (d)    disgorgement of profits;

   (e)    an equitable lien;

   (f)    a constructive trust;

(g)      restitution;

(h)      full disclosure of the foregoing acts and practices;

(i)      an injunction against further violations; and/or

(j)      any other remedy the Court deems proper.

## COUNT IV

**ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3)**
**for Violations of ERISA § 404, 29 U.S.C. § 1104**
**Against All Defendants on Behalf of the ERISA Subclass**

193.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

194.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

195.    In setting the amount of Overcharges and taking Overcharges, including Spread, Defendants have breached their fiduciary duties of loyalty and prudence.

196.    Further, in failing to put the interests of participants and beneficiaries first in managing and administering pharmacy benefits, Defendants have breached their fiduciary duty of loyalty. And in acting in their own self-interest, Defendants have violated the "exclusive purpose" standard.

197.    Defendants further breached these duties by misrepresenting and failing to disclose to the ERISA Subclass the fact or amount of the excessive cost-sharing payments they were being charged, and in misrepresenting and failing to disclose to the ERISA Subclass that plan participants

were paying more in cost-sharing than the cost of the drug if purchased outside their respective plans—and then barring pharmacies from advising ERISA Subclass members that they could pay less for a drug by purchasing it outside of their respective plans.

198.    In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. As noted herein, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

199.    OHI failed to adequately monitor the activities of Optum, including *inter alia*, failing to monitor the prices charged by Optum for prescription medications provided to Plaintiff and the ERISA Subclass and permitting and/or participating in the Overcharge and Clawback Scheme described herein. As such, OHI failed to monitor its appointees, formal delegees, and informal designees in the performance of its fiduciary duties.

200.    Finally, it is never prudent to require or allow excessive compensation in the context of an ERISA-covered plan.  In so doing, Defendants violated their duty of prudence.

201.    Plaintiff and the ERISA Subclass have been damaged and suffered losses in the amount of the Overcharge compensation Defendant took.

202.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

203.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

204.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

205.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the ERISA Subclass, including but not limited to:

(a)    an accounting;

(b)    a surcharge;

(c)    correction of the transactions;

(d)    disgorgement of profits;

(e)    an equitable lien;

(f)    a constructive trust;

(g)    restitution;

(h)    full disclosure of the foregoing acts and practices;

(i)    an injunction against further violations; and/or

(j)    any other remedy the Court deems proper.

## COUNT V

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 405(a), 29 U.S.C. § 1105(a)**
**Against All Defendants on Behalf of the ERISA Subclass**

206.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

207.   As alleged above, Defendants were fiduciaries within the meaning of ERISA §
3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive
purpose, and prudence and they were prohibited from engaging in self-interested and conflicted
transactions.

208.   As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a
fiduciary, in addition to any liability which it may have under any other provision, for a breach of
fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach
and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Defendants
breached all three provisions.

209.   **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29 U.S.C.
§ 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another
fiduciary if it has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts
under the circumstances to remedy the breach.  Upon information and belief, each Defendant knew
of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy
those breaches.

210.   **Knowing Participation in a Breach.**  ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1),
imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with
respect to the same plan if it participates knowingly in, or knowingly undertakes to conceal, an act
or omission of such other fiduciary, knowing such act or omission is a breach.  Upon information
and belief, each Defendant participated in the breaches by the other fiduciaries.

211.   **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability
on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the
administration of its specific responsibilities which give rise to its status as a fiduciary, it has

enabled another fiduciary to commit a breach, even without knowledge of the breach.  Upon information and belief, each Defendant enabled the breaches by the other fiduciaries.

212.    Plaintiff and the ERISA Subclass have been damaged in the amount of the Overcharges Defendants took.

213.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

214.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the ERISA Subclass, including but not limited to:

> (a)    an accounting;
>
> (b)    a surcharge;
>
> (c)    correction of the transactions;
>
> (d)    disgorgement of profits;
>
> (e)    an equitable lien;
>
> (f)    a constructive trust;
>
> (g)    restitution;
>
> (h)    full disclosure of the foregoing acts and practices;
>
> (i)    an injunction against further violations; and/or
>
> (j)    any other remedy the Court deems proper.

## COUNT VI

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### for Knowing Participation in Violations of ERISA
### In the Alternative, Against All Defendants on Behalf of the ERISA Subclass

215.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

216.    As noted above, fiduciary status is not required for liability under ERISA where non-fiduciaries participate in and/or profit from a fiduciary's breach or prohibited transaction. Accordingly, Plaintiff makes claims against Defendants even though one or more of them may be found not to have fiduciary status with respect to the ERISA Plans.  As nonfiduciaries, they nevertheless must restore unjust profits or fees and are subject to other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and pursuant to *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000).

217.    To the extent any one or more of them are not found to be fiduciaries, Defendants had actual or constructive knowledge of and participated in and/or profited from the prohibited transactions and fiduciary breaches alleged in Counts II-V by the Defendants who are found to be fiduciaries, and these nonfiduciaries are liable to disgorge ill-gotten gains and/or plan assets and to provide other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and *Harris Trust*.

218.    As a direct and proximate result of the fiduciary breaches and prohibited transactions alleged in Counts II-IV and the participation therein of the Defendants, the members of the ERISA Subclass directly or indirectly lost millions of dollars and/or plan assets (both participant pharmacy payments and Plan contracts) were improperly used to generate profits for the fiduciary Defendants, their affiliates, and third parties.  The fiduciary Defendants collected

- 63 -

Case 7:18-cv-01427-VB   Document 1   Filed 02/16/18   Page 64 of 86

and/or paid these amounts to themselves, their affiliates, or third parties from plan assets or generated them through improper leveraging of plan assets.

219.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the ERISA Subclass, including but not limited to:

        (a)    an accounting;

        (b)    a surcharge;

        (c)    correction of the transactions;

        (d)    disgorgement of profits;

        (e)    an equitable lien;

        (f)    a constructive trust;

        (g)    restitution;

        (h)    full disclosure of the foregoing acts and practices;

        (i)    an injunction against further violations; and/or

        (j)    any other remedy the Court deems proper.

## COUNT VII

### For Violating RICO, 18 U.S.C. § 1962(c)
### Against OHI on Behalf of the Class

220.    Plaintiff incorporate by reference each and every allegation above as if set forth fully herein.

221.    At all relevant times, OHI was associated with an enterprise consisting of Optum ("Optum Enterprise").

222.    Optum is a legal entity enterprise within the meaning of 18 U.S.C. §1961(4).

223.    At all relevant times, Optum has been engaged in, and its activities affect, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

- 64 -

224.    OHI is legally and factually distinct from Optum.

225.    OHI and Optum are separate and distinct from the pattern of racketeering acts in which Optum engaged.

226.    OHI agreed to and did conduct affairs and participate in the conduct of the Optum Enterprise.  OHI operated and managed the affairs of the Optum Enterprise through, among other ways, contracts, and agreements through which OHI was able to and did exert control over Optum, which served as PBM for OHI.

227.    Optum has contracts with the pharmacies in its network, and a "Provider Manual" that "is incorporated in and is a part of" a provider's "Agreement" with Optum.[25]  The contracts and the Manual describe the manner in which claims for medically necessary prescription drugs, including claims by Plaintiff and Class members, are submitted and processed.

228.    OHI had the ability to and did in fact direct the Optum Enterprise to intentionally misrepresent—and to direct its providers to intentionally misrepresent—the cost-sharing Overcharges Plaintiff and the Class members were required to pay to receive medically necessary prescription drugs.   OHI further directed Optum and its pharmacies to collect a specified Overcharge amount.  This specified Overcharge exceeded the amount OHI had promised Plaintiffs and the Class members they would pay for medically necessary prescription drugs.  After Plaintiffs and Class members overpaid for the medically necessary services and equipment, OHI directed Optum to return some or all of these funds to OHI as Clawbacks.

---

[25]    *Provider Manual* at 3, available at https://learn.optumrx.com/content/dam/orx-rxmicros/pharmacy-manual/ORX5979A_170616_OptumRx2018PharmacyManual_FINALv2.pdf

229.     As described herein, Optum is a separate legal entity, whose purpose is to provide Plaintiff and the Class medically necessary prescription drugs in accordance with the terms of their Plans.  These legitimate and lawful activities are not being challenged in this Complaint.

230.     OHI, however, also directs the Optum Enterprise to serve an unlawful purpose; that is, to create a mechanism through which OHI could obtain additional monies beyond what Plaintiffs and Class members should have paid under their Plans for medically necessary prescription drugs. This fraudulent Overcharge Scheme, was not legitimate.

231.     OHI agreed to and did conduct and participate in the conduct of Optum's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs and the Class members.  OHI used Optum to facilitate its goal of overcharging for medically necessary prescription drugs, and was unjustly enriched by overcharging for medically necessary prescription drugs.

232.     As described herein, OHI directly and indirectly conducted and participated in the conduct of the Optum Enterprise through a pattern of racketeering and activity in violation of 18 U.S.C. § 1962(c) for the unlawful purpose of defrauding Plaintiffs and Class members.

233.     Pursuant to and in furtherance of its fraudulent billing scheme, OHI directed Optum to commit multiple related predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to, and during, the Class Period and continue to commit such predicate acts, in furtherance of their fraudulent billing scheme, including: (a) mail fraud, in violation of 18 U.S.C. § 1341; and (b) wire fraud, in violation of 18 U.S.C. § 1343.

234.     As alleged herein, OHI directed Optum to engage in a fraudulent billing scheme to defraud Plaintiff and Class members through Overcharges, including Spreads, and Clawbacks. This "Overcharge Scheme" entails: (a) OHI misrepresenting to Plaintiff and Class members

- 66 -

through form Plan language that they would pay a certain amount for medically necessary prescription drugs with a present intent to have Plaintiff pay a higher amount; (b) OHI entering into an agreement with Optum, under which it agreed to process claims submitted by Plaintiff and the Class members for medically necessary prescription drugs in accordance with the terms of a particular Plan with a present intent that the claims processing would violate the Plan terms; (c) OHI entering into an agreement with Optum, under which Optum's created or maintained a provider network by way of contracts and a Provider Manual, which require pharmacies participating in the network to charge Plaintiff and Class members for medically necessary prescription drugs in fraudulent amounts specified by OHI and/or Optum; (d) Optum misrepresenting with OHI's knowledge and/or direction the correct charge for medically necessary prescription drugs as specified in Plaintiff's and Class members' Plans, and directing providers participating in the provider networks to collect those improper amounts; (e) OHI's and/or Optum's retention, directly or indirectly, of a portion of the amounts improperly collected by Optum and/or its providers, in violation of the Plaintiff's and Class member's Plans with OHI; and (f) OHI imposing an agreement or directing Optum to impose an agreement (1) barring providers from advising Plaintiffs and Class members that they could pay less for medically necessary prescription drugs by purchasing them outside of their respective Plans and (2) barring providers from selling in a transaction that would avoid the Overcharge.

235.    In sum, OHI's Overcharge Scheme took money from Plaintiff and Class members through deceit and false pretenses.  OHI intentionally devised such an Overcharge Scheme and was a knowing and active participant in the scheme to defraud Plaintiff and Class members.  OHI intended at the time it issued its Plan and knew that it would overcharge for medically necessary

prescription drugs and that they would retain such amounts.  OHI specifically intended to commit fraud, and such intent can be inferred from the totality of the allegations herein.

236.    It was and is reasonably foreseeable to OHI that mail, interstate carriers and wire transmissions would be used—and mail, interstate carriers and wire transmissions were in fact used—in furtherance of the scheme, including but not limited to the following manner and means: (a) whenever a Plaintiff or Class member seeks to receive medically necessary prescription drugs, the providers participating in Optum's provider network enter information into a computer and transmit it via interstate mail or carrier and/or wire transmissions to Optum for processing, and Optum transmits back to the pharmacy the amount of the Overcharge; (b) OHI and/or Optum's collecting of the Overcharge money takes place via interstate mail or carrier or wire transmissions; (c) Plaintiff and Class members make payments to Optum using credit or debit cards, which require the use of interstate wire transmissions; (d) prescription drugs received by Plaintiff and Class members through OHI's fraudulent scheme were delivered by mail or interstate carrier and (e) OHI's and Optum's representatives communicated with each other by mail, interstate carrier, and/or wire transmissions in order to carry out the fraudulent scheme.

237.    Having devised its Overcharge Scheme and intending to defraud Plaintiff and Class members, on or about the dates set forth below, OHI intentionally and unlawfully transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme.

238.    For example, when Plaintiff Mohr-Lercara purchased prescription drugs, Defendants caused to be transmitted mail, interstate deliveries and/or wire transmissions for the purpose of executing such scheme and artifice on at least the following dates along with the amounts charged and the Overcharges, as Spread, as described below:

| Filled Date | Usual And Customary | Approved Ingredient Cost | Approved Dispensing Fee | Amount Paid to Pharmacy | Copay | Spread / Clawback |
|---|---|---|---|---|---|---|
| 10/30/2015 | | | | | $15.00 | |
| 10/30/2015 | | | | | $15.00 | |
| 10/30/2015 | | | | | $15.00 | |
| 10/30/2015 | | | | | $15.00 | |
| 10/02/2015 | | | | | $15.00 | |
| 10/02/2015 | | | | | $15.00 | |
| 10/02/2015 | | | | | $15.00 | |
| 10/02/2015 | | | | | $15.00 | |
| 09/08/2015 | | | | | $10.00 | |
| 09/08/2015 | | | | | $15.00 | |
| 09/01/2015 | | | | | $15.00 | |
| 08/31/2016 | | | | | $15.00 | |
| 07/26/2016 | | | | | $15.00 | |
| 04/12/2016 | | | | | $15.00 | |
| 03/10/2016 | | | | | $15.00 | |
| 03/10/2016 | | | | | $15.00 | |

239.    On or about the dates identified above, Optum sent and received U.S. Mail or interstate wire transmissions in connection with (a) determining whether Plaintiff and the prescription drugs were covered under her Plan and how much she should pay for drugs; (b) communicating to Plaintiff the amount of the Overcharge; (c) processing Plaintiff's payment for such drugs and Overcharges; and (d) processing OHI's payments to and/or Clawbacks from the provider.

240.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

241.    Each such use of U.S. Mail and interstate wire facilities as alleged constitutes a separate and distinct predicate act.

242.    The predicate acts were each related to one another in that: (a) OHI directed Optum to undertake each predicate act with a similar purpose of effectuating its scheme to defraud

- 69 -

Plaintiff and Class members; (b) each predicate act involved the same participants—(1) OHI, which directed Optum to make the fraudulent statements and overcharge Plaintiff and Class members, (2) pharmacies within Optum's provider network, which processed claims and provided drugs, and (3) Plaintiff and Class members, who received the fraudulent statements and relied on them in paying the fraudulent amounts for medically necessary prescription drugs; (c) each predicate act involved similar victims—Plaintiff and Class members who purchased medically necessary prescription drugs; and (d) each predicate act was committed the same way—in response to a request from Plaintiff or Class members to purchase medically necessary prescription drugs, the provider participating in Optum's provider network transmitted a request via U.S. Mail or interstate wire to Optum.  Optum, using the U.S. Mail or interstate wire, responded directing the provider to execute Optum's scheme, and Optum later effectuated its Overcharge Scheme by using the U.S. Mail or interstate wire to overbill the Plaintiff or Class member; and (e) the predicate acts could not have been conducted, nor Optum's scheme effectuated, without the existence and use of Optum.

243.    On information and belief, OHI conducts such racketeering activity through Optum as an ongoing and regular way of doing business, and continues and will continue to engage in such racketeering activity.

244.    As a direct and proximate result of OHI's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff and Class members have been injured in their business and property. Plaintiff Mohr-Lercara and Class members were injured by reason of OHI's RICO violations because they directly and immediately received through interstate wires or mail a fraudulent demand for payment, incurred a corresponding debt and paid fraudulent charges for medically necessary prescription drugs.  Their injuries were proximately caused by OHI's violations of 18

U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of OHI's RICO violations (and commission of underlying predicate acts) and, but for OHI's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

245.   Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiff and the Class members are entitled to recover, threefold, their damages, costs, and attorneys' fees from OHI and other appropriate relief.

## COUNT VIII

### For Violating RICO, 18 U.S.C. § 1962(c)
### Against Optum on Behalf of the Class

246.   Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

247.   Plaintiffs, Class members, and Optum are "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3), 1964(c).

248.   At all relevant times, Optum conducted or participated in the conduct of an enterprise (the "Optum Network Enterprise"), which is alternatively alleged for the purpose of this Count as consisting of (a) an association-in-fact enterprise of Optum and all providers in Optum's provider, or pharmacy, network; (b) separate two-party association-in-fact enterprises of Optum and each provider in Optum's provider network; (c) an association-in-fact enterprise of all providers in Optum's provider network; or (d) each provider in Optum's provider network as a legal entity enterprise.

249.   At all relevant times, the Optum Network Enterprise has been engaged in, and its activities affect, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

250.   Optum is legally and factually distinct from the Optum Network Enterprise.

251.    Optum and the Optum Network Enterprise are separate and distinct from the pattern of racketeering acts in which they engaged.

252.    Optum agreed to and did conduct and participate in the conduct of the Optum Network Enterprise's affairs.  Optum operated and managed the affairs of the Optum Network Enterprise through a series of uniform contracts, agreements, and Provider Manuals with providers through which Optum was able to and did exert control over the Optum Network Enterprise.

253.    For example, Optum issues a Provider Manual to providers participating in the Optum Network Enterprise.[26]   The Provider Manual "is incorporated in and is a part of" a provider's "Agreement" with Optum.[27]  If the providers' agreements with Optum conflict with the Provider Manual, the Provider Manual "will supersede" the agreement.[28]  Optum "reserves the right to limit [pharmacies'] participation in a network in its sole discretion," and directs that providers "shall not be allowed to opt-out of any networks without the written consent" of Optum.[29]  By submitting a claim to Optum, the providers agree that they are acknowledging their participation with one another in Optum's network, and that they accept "all corresponding terms and conditions, including the rates and reimbursements of Claims, for such network."[30]

254.    Also pursuant to the Provider Manual, providers "must charge the Member the Cost-Sharing Amount indicated in the online response and only this amount.  Waiving the amount associated with the Member Cost-Sharing is strictly prohibited, unless required by law (e.g.,

---

[26] *Provider Manual*, available at https://learn.optumrx.com/content/dam/orx-rxmicros/pharmacy-manual/ORX5979A_170616_OptumRx2018PharmacyManual_FINALv2.pdf

[27] *Id.* at 3.

[28] *Id.* at 3.
[29] *Id.*

[30] *Id.* at 44.

Qualified Medicare Beneficiary) and is considered a material breach of the Agreement."[31] "[R]eimbursement pricing information, as well as prices paid to Network Pharmacy Provider for individual Claims under this Agreement are confidential and proprietary Administrator information and may not be disclosed on Member receipts or insurance profiles."[32]  Providers are further directed to "treat as confidential and proprietary," *inter alia*, Optum's "pricing, programs, services, business practices, databases, software, layouts, designs, formats, processes, applications, systems, [and] technology, files," as well as the terms of the Provider Manual itself.[33]

255.    Also under the terms of the Provider Manual, providers are prohibited from "[o]ffering a cash price, or a different cash prices than the U&C price, to the Member as an alternative to or in lieu of submitting a Claim for a Covered Prescription Service via the POS System."[34]

256.    The Provider Manual defines "[n]on-compliance" to include "the disclosure of confidential information or data" or "the collection of a patient pay amount that differs from the amount specified in the Claims response."[35]

257.    The Provider Manual explains that "[f]ailure to adhere to any of the provisions . . . which includes this [Provider Manual] . . . will be viewed as a breach of the Agreement."[36] Pharmacies are "subject to penalties or sanctions" if Optum determines that the pharmacies

---

[31] *Id.* at 56.

[32] *Id.*; *see also id.* at 124.

[33]     *Id.* at 123.

[34] *Id.* at 58; *see also id.* at 106.

[35]     *Id.* at 106.

[36]     *Id.* at 105.

"disclosed confidential information. . . ."[37]  These penalties include "at a minimum . . . $5,000 per incident," and pharmacies "may be subject to additional actions" by Optum, "up to termination from participation" in Optum's pharmacy network.[38]  Pharmacies terminated from participation in Optum's pharmacy network are banned from the pharmacy network for five years and, only after such a period, may apply for reinstatement at Optum's "sole discretion."[39]

258.    Providers in the Optum Network Enterprise are symbiotically dependent upon one another.  Individual providers join the Optum Network Enterprise because other providers have agreed to join the Optum Network Enterprise and because joining the Optum Network Enterprise allows Providers access to OHI's plan members and generates more revenue for all of the Providers.  By agreeing to collectively participate with one another in the Optum Network Enterprise, each individual provider is able to attract more OHI plan members than they would if they worked alone.

259.    As alleged herein, Optum engaged in a fraudulent billing scheme to defraud Plaintiff and Class members through Overcharges, Spreads and Clawbacks.  In operating and managing the affairs of the Optum Network Enterprise, Optum exploited the uniform contracts and agreements it entered with providers to implement the fraudulent Overcharge Scheme, knowing that the Plans did not permit the Overcharge Scheme.

260.    In particular, this "Overcharge Scheme" entails:  (a) Optum's entering into agreements with OHI through which Optum agreed to process claims submitted on behalf of Plaintiff and the Class members for medically necessary prescription drugs in accordance with the terms of a particular Plan, with a present intent to violate the Plan terms and impose fraudulent

---

[37]     *Id.*

[38]     *Id.*

[39]     *Id.* at 106.

charges; (b) Optum's creation of a provider network through which Plaintiff and Class members could receive medically necessary prescription drugs and entering into agreements requiring providers participating in the provider network to charge for prescription drugs in  fraudulent amounts specified by Optum, and prohibiting providers participating in the provider network from discussing any other amount with Plaintiff or the Class members; (c) Optum's knowingly misrepresenting the correct charge for prescription drugs as specified in Plaintiff and Class members' Plans; and (d) Optum's retention directly or indirectly, of a portion of the amounts improperly collected, in violation of the Plaintiff and Class members' Plans, and enforcing its agreements with providers participating in the provider network to prevent them from disclosing or avoiding the unlawful and improper plan or scheme.

261.    The scheme to defraud also includes various misrepresentations and omissions of material fact, including, but not limited to: (a) misrepresenting the charge for medically necessary prescription drugs as specified in the Plan language, which misrepresentations were false when made because of Optum's knowledge and intent at that time that Class members would be Overcharged; (b) misrepresenting that a material portion of the "co-payments" that Optum instructed providers to collect were payments for prescription drugs and were "co-" payments by the insureds rather than unlawful payments to Defendants; (c) misrepresenting that prescription drug payments that Optum instructed providers to collect under deductible portions of health insurance policies were based on prescription drug prices paid to the pharmacies; (d) the failure to disclose that co-insurance payments that Optum instructed providers to collect were based on prescription drug prices that exceeded the contracted fee between the PBM and the providers; and (e) the failure to disclose and agreement not to disclose that Class members could pay less for a drug by purchasing it outside of their respective insurance policies.

262.    Pursuant to the Overcharge Scheme, Optum (a) entered into agreements with providers and knowingly instructed the providers to overcharge Plaintiff and Class members for prescription drugs beyond what was allowed under the Plans; (b) overcharged Plaintiff and Class members for prescription drugs; and (c) entered agreement with providers prohibiting the disclosure of the unlawful scheme and/or the sale of prescription drugs to Plaintiff and Class members at prices other than the unlawful prices.  As such, the plan was to deprive Plaintiff and Class members of money by deceit and false pretenses, and it was characterized by a departure from community standards of fair play and candid dealings.

263.    The scheme to defraud consists of Optum wrongly depriving Plaintiffs and Class members of their property rights by dishonest methods or schemes. Such scheme was willfully devised by Optum (along with OHI) at the time that OHI issued its Plans to Plaintiff and Class members.   Optum was a knowing and active participant in the scheme to defraud. Optum specifically intended to commit fraud at the time that OHI issued its Plans to Class members, and such intent can be inferred from the totality of the allegations herein.

264.    The purpose of the scheme was and is to cause Plaintiffs and Class members to overpay for medically necessary prescription drugs.

265.    As described herein, the Optum Network Enterprise has an ascertainable structure and has functioned and continues to function with a common purpose and as a continuous unit. The purpose of the Optum Network Enterprise is to provide Plaintiff and the Class prescription drugs in accordance with the terms of their Plans.  Through the Optum Network Enterprise, Optum provides prescription drugs on behalf of OHI.  These legitimate and lawful activities are not being challenged in this Complaint.

266.    The members of the Optum Network Enterprise also, however, share a fraudulent common purpose to create an unlawful mechanism through which Optum and OHI could secretly obtain additional monies beyond what Plaintiff and the Class should have paid under their Plans for medically necessary prescription drugs, enabling the members to maintain their participation in and income from the network.  This Overcharge Scheme was not legitimate.

267.    To provide its services, the Optum Network Enterprise functions as a continuing, cohesive unit.  Optum processes claims received from providers in its provider network and specifies which prescription drugs Plaintiff and Class members may receive through their Plans. Pharmacies participating in Optum's provider network provide medically necessary prescription drugs to Plaintiff and Class members and submit claims and convey insurance information to Optum.

268.    On information and belief, the Optum Network Enterprise has continually existed for several years and remains in existence.

269.    Optum agreed to and did conduct and participate in the conduct of the Optum Network Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff and the Class members.  Optum used the Optum Network Enterprise to facilitate its goal of overcharging for medically necessary prescription drugs.

270.    As described herein, Optum directly and indirectly conducted and participated in the conduct of the Optum Network Enterprise affairs through a pattern of racketeering and activity in violation of 18 U.S.C. § 1962(c) for the unlawful purpose of defrauding Plaintiff and Class members.

271.    Pursuant to and in furtherance of its fraudulent Overcharge Scheme, Optum has committed multiple related predicate acts of "racketeering activity," as defined in 18 U.S.C. §

1961(5), prior to, and during, the Class Period and continues to commit such predicate acts, in furtherance of its "Overcharge Scheme," including: (a) mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343.

272.    In sum, the Overcharge Scheme took money from Plaintiff and Class members through deceit and false pretenses.   Optum intentionally devised and/or implemented the Overcharge Scheme and was a knowing and active participant in the Overcharge Scheme to defraud Plaintiff and Class members.  Optum intended at the time that OHI issued its Plans to Plaintiff and Class members and knew that it would overcharge for the costs of medically necessary prescription drugs.  Optum specifically intended to commit fraud, and such intent can be inferred from the totality of the allegations herein.

273.    It was and is reasonably foreseeable to Optum that mail, interstate carriers and wire transmissions would be used—and mail, interstate carriers and wire transmissions were in fact used—in furtherance of the Overcharge Scheme, including but not limited to the following manner and means: (a) whenever a Plaintiff or Class member seeks to receive prescription drugs, the providers participating in Optum's provider network enter information into a computer and transmit it via interstate mail or carrier and/or wire transmissions to Optum for adjudication; (b) Optum's receipt of money takes place via interstate mail or carrier or wire transmissions; (c) Plaintiff and Class members make payments using credit or debit cards, which require the use of interstate wire transmissions; (d) prescription drugs purchased through Optum's fraudulent scheme were delivered by mail or interstate carrier and Optum's representatives and providers participating in Optum's provider network communicated with each other mail, interstate carrier and/or wire transmissions in order to carry out the fraudulent scheme.

274.    Having devised and/or implemented the Overcharge Scheme, and intending to defraud Plaintiff and Class members, on or about the dates set forth below, Optum intentionally and unlawfully transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme.

275.    For example, when Plaintiff Mohr-Lercara purchased prescription drugs, Defendants caused to be transmitted by mail, interstate deliveries and/or wire transmissions for the purpose of executing such scheme and artifice on the following dates along with the amounts charged and the Overcharges, as Spread, as described below:

| Filled Date | Usual And Customary | Approved Ingredient Cost | Approved Dispensing Fee | Amount Paid to Pharmacy | Copay | Spread / Clawback |
|---|---|---|---|---|---|---|
| 10/30/2015 | | | | | $15.00 | |
| 10/30/2015 | | | | | $15.00 | |
| 10/30/2015 | | | | | $15.00 | |
| 10/30/2015 | | | | | $15.00 | |
| 10/02/2015 | | | | | $15.00 | |
| 10/02/2015 | | | | | $15.00 | |
| 10/02/2015 | | | | | $15.00 | |
| 10/02/2015 | | | | | $15.00 | |
| 09/08/2015 | | | | | $10.00 | |
| 09/08/2015 | | | | | $15.00 | |
| 09/01/2015 | | | | | $15.00 | |
| 08/31/2016 | | | | | $15.00 | |
| 07/26/2016 | | | | | $15.00 | |
| 04/12/2016 | | | | | $15.00 | |
| 03/10/2016 | | | | | $15.00 | |
| 03/10/2016 | | | | | $15.00 | |

276.    On or about these dates, BJs Drugs (for Plaintiff Mohr-Lercara), an Optum Network provider located in Forest Hills, New York, sent and received mail, interstate messages or deliveries and/or wire transmissions in connection with (a) determining whether the Plaintiff and

the prescription drugs were covered under her Plan and how much Plaintiff should pay for the drugs; (b) processing Plaintiff's payments for such prescription drugs; and (c) processing the Optum payments, including any Overcharges, and/or Clawbacks.

277.    These acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

278.    Each such use of U.S. Mail and interstate wire facilities as alleged constitutes a separate and distinct predicate act.

279.    The predicate acts were each related to one another in that: (a) Optum directed a provider through the U.S. mails or wire to provide Plaintiff with equipment or services and Optum then overbilled Plaintiff and Class members through the U.S. mail or wire; (b) each predicate act involved the same participants—Optum, which made the fraudulent statements and overcharged Plaintiff and Class members; network providers within Optum's provider network, which processed claims and provided drugs, and Plaintiff and Class members, who received the fraudulent statements and relied upon them in paying the fraudulent amounts for prescription drugs; (c) each predicate act involved similar victims—Plaintiff and Class members who purchased prescription drugs; and (d) each predicate act was committed the same way—in response to a request from Plaintiff or Class members to purchase prescription drugs, the provider participating in the Optum provider network transmitted a request via U.S. Mail or interstate wire to Optum, who, using the U.S. Mail or interstate wire, responded directing the provider to execute Optum's scheme, and Optum later effectuated its Overcharge Scheme by using the U.S. Mail or interstate wire to overbill the Plaintiff or Class member; and (e) the predicate acts could not have been conducted, nor OHI's scheme effectuated, without the existence and use of Optum.

280.    As a direct and proximate result of Optum's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff Mohr-Lercara and the Class members have been injured in their business and property.  Plaintiff and the Class members were injured by reason of Optum's RICO violations because they directly and immediately received through interstate wires or mail a fraudulent demand for payment, incurred a corresponding debt and paid fraudulent charges for prescription drugs.  Their injuries were proximately caused by Optum's violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of Optum's RICO violations (and commission of underlying predicate acts) and, but for Optum's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

281.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiff and the Class members are entitled to recover, threefold, their damages, costs, and attorneys' fees from Optum and other appropriate relief.

## COUNT IX

### Violation of RICO, 18 U.S.C. § 1962(d)
### Against All Defendants on Behalf of the Nationwide Class

282.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

283.    During the Class Period, Defendants agreed and conspired to violate 18 U.S.C. §1962(c).  Specifically, OHI and Optum conspired to engage in the "Overcharge Scheme." Defendants conspired with themselves and/or with other unnamed PBMs to engage in the "Overcharge Scheme."  Defendants conduct and participate, directly or indirectly, in the conduct of the affairs of the OHI Enterprise (described above) and the Optum Network Enterprise

(described above) through a pattern of racketeering activity (described above) which resulted in Plaintiff and Class members overpaying for medically necessary prescription drugs. The conspiracy to violate 18 U.S.C. §1962(c) constitutes a violation of 18 U.S.C. §1962(d).

284.    In furtherance of this conspiracy, OHI and Optum and their co-conspirators committed numerous overt acts, as alleged above, in the pattern of racketeering described above, including mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343. OHI and Optum agreed to and did engage in a fraudulent "Overcharge Scheme" to defraud Plaintiff and Class members (described above). OHI and/or Optum intended to defraud Plaintiff and Class members by overcharging for medically necessary prescription drugs (described above). OHI and/or Optum reasonably foresaw that the U.S. Mail and/or interstate wire would be used in furthering the "Overcharge Scheme." OHI and/or Optum used the U.S. Mail and/or interstate wire to effectuate the "Overcharge Scheme" by transmitting various misrepresentations and omissions of material fact resulting in overcharges for medically necessary prescription drugs (described above).

285.    OHI and/or Optum knew that their predicate acts were part of a pattern of racketeering activity and agreed to commission of those acts to further the "Overcharge Scheme" (described above).

286.    As a direct and proximate result, and by reason of the activities of OHI and/or Optum and their conduct in violation of 18 U.S.C. §1962(d), Plaintiff and the Class have been injured in their business and property within the meaning of 18 U.S.C. §1964(c) and are entitled to recover treble damages, together with the costs of this lawsuit, expenses, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class and Subclass, prays for relief as follows as applicable for the particular claim:

A.      Certifying this action as a class action and appointing Plaintiff and the counsel listed below to represent the Class and Subclass;

B.      Finding that Defendants are fiduciaries and/or parties in interest as defined by ERISA;

C.      Finding that Defendants violated their fiduciary duties of loyalty and prudence to ERISA Subclass members and awarding Plaintiff and the ERISA Subclass such relief as the Court deems proper;

D.      Finding that Defendants engaged in prohibited transactions and awarding Plaintiff and the ERISA Subclass such relief as the Court deems proper;

E.      Finding that Defendants denied Plaintiff, the Class, and the Subclass benefits and their rights under the policies and awarding such relief as the Court deems proper;

F.      Enjoining Defendants from further such violations;

G.      Finding that Plaintiff and the ERISA Subclass are entitled to clarification of their rights under the ERISA Plans and awarding such relief as the Court deems proper;

H.      Awarding Plaintiff, the Class, and the Subclass damages, surcharge, and/or other monetary compensation as deemed appropriate by the Court;

I.      Ordering Defendants to restore all losses to Plaintiff and the ERISA Subclass and disgorge unjust profits and/or other assets of the ERISA Plans

J.      Adopting the measure of losses and disgorgement of unjust profits most advantageous to Plaintiff and the ERISA Subclass to restore Plaintiff's losses, remedy Defendants'

windfalls, and put Plaintiff in the position that she would have been in if the fiduciaries of the ERISA Plans had not breached their duties or committed prohibited transactions;

K.      Ordering other such remedial relief as may be appropriate under ERISA, including the permanent removal of Defendants from any positions of trust with respect to the ERISA Plans of the members of the ERISA Subclass and the appointment of independent fiduciaries to serve in the roles Defendants occupied with respect to the ERISA Plans of the ERISA Subclass, including as pharmacy benefit administrators and managers;

L.      Awarding treble damages in favor of Plaintiff and the Class members against all Defendants for all damages sustained as a result of Defendants' violations of RICO, in an amount to be proven at trial, including interest thereon;

M.      Awarding Plaintiff, the Class, and the Subclass equitable relief to the extent permitted by the above claims;

N.      Finding that Defendants are jointly and severally liable as fiduciaries and/or co-fiduciaries and/or parties in interest;

O.      Awarding Plaintiff's counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine;

P.      Awarding Plaintiff's counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to RICO, 18. U.S.C. § 1964(c).

Q.      Awarding Plaintiff, the Class, and the Subclass their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

R.      Finding that Defendants are jointly and severally liable for all claims; and

S.    Awarding such other and further relief as may be just and proper, including

pre-judgment and post-judgment interest on the above amounts.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 16, 2018                    Respectfully submitted,

*/s/ Craig A. Raabe*
Robert A. Izard
Craig A. Raabe
**IZARD, KINDALL & RAABE, LLP**
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone:  860-493-6292
Facsimile: 860-493-6290
rizard@ikrlaw.com
craabe@ikrlaw.com
cbarrett@ikrlaw.com

William H. Narwold
Mathew Jasinski
**MOTLEY RICE LLC**
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone:  860-882-1681
Facsimile:   860-882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Joseph P. Guglielmo
Carey Alexander
**SCOTT+SCOTT,**
**ATTORNEYS AT LAW, LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169

- 85 -

Telephone:  212-223-6444
Facsimile:   212-223-6334
jguglielmo@scott-scott.com
calexander@scott-scott.com

Erin Green Comite
**SCOTT+SCOTT, ATTORNEYS AT LAW,
LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  860-537-5537
Facsimile:   860-537-4432
ecomite@scott-scott.com

Derek W. Loeser
Gretchen S. Obrist
**KELLER ROHRBACK, LLP**
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone:  206- 623-1900
Facsimile:   206-623-3384
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

Ronen Sarraf
Joseph Gentile
**SARRAF GENTILE LLP**
14 Bond Street, Suite 212
Great Neck, NY 11021
Telephone:  516-699-8890
Facsimile:   516-699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com