UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ANNA MOHR-LERCARA, individually and on :
behalf of all others similarly situated,       :
                Plaintiff,       :
v.                                                           :
                                                           :
OXFORD HEALTH INSURANCE, INC.;     :
OPTUM, INC.; and OPTUM RX, INC.,        :
                Defendants.       :
--------------------------------------------------------------x

**OPINION AND ORDER**

18 CV 1427 (VB)

Briccetti, J.:

       Plaintiff Anna Mohr-Lercara brings this putative class action against defendants Oxford

Health Insurance, Inc. ("Oxford"); Optum, Inc. ("Optum"); and Optum Rx, Inc. ("OptumRx"),

alleging violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

§ 1001, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

§ 1961.

       Now pending is defendants' motion for summary judgment.  (Doc. #117).

       For the following reasons, the motion is GRANTED.

       The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

**BACKGROUND**

       The parties have submitted memoranda of law, declarations with exhibits, and statements

of undisputed material facts pursuant to Local Civil Rule 56.1, which together reflect the

following factual background.

I.     Plaintiff's Plan

       Plaintiff participated in an employer-sponsored health insurance plan subject to ERISA

(the "plan") from October 4, 2010, to December 31, 2014, and again from August 1, 2015, to

August 31, 2016.  The plan was offered and underwritten by Oxford.  Optum was an affiliate of

1

Oxford, and one of its subsidiaries, OptumRx, was Oxford's pharmacy benefit manager starting in October 2013.

      A.     <u>2010 to 2013 Plan</u>

From 2010 to 2013, plaintiff's prescription drug coverage under the plan was outlined in a rider (the "Drug Rider") to the plan's Certificate of Coverage.  (Doc. #120-1 at ECF 103–11; Doc. #120-2, at ECF 117–22; Doc. #120-3 at ECF 115–20; Doc. #120-4 at ECF 115–20).[1]  The Drug Rider set forth plaintiff's payment obligations for covered outpatient prescription drugs, which differed depending on how plaintiff purchased them.

First, for covered prescription drugs purchased from a "Network Pharmacy," plaintiff was "responsible for paying the lower of": (i) "the applicable Out-of-Pocket Expense," meaning the amount set forth in the plan's "Summary of Benefits"; or (ii) "the Network Pharmacy's Usual and Customary Charge," meaning "the usual fee that a pharmacy charges individuals for a Prescription Drug Product without reference to reimbursement to the pharmacy by third parties." (Doc. #120-1 at ECF 103, 108; Doc. #120-2 at ECF 117, 122; Doc. #120-3 at ECF 115, 120; Doc. #120-4 at ECF 115, 120).

A "Network Pharmacy" was defined as

a pharmacy that has:
- entered into an agreement with us or our designee to provide Prescription Drug Products to Members;
- agreed to accept specified reimbursement rates for dispensing Prescription Drug Products; and
- has been designated by us as a Network Pharmacy.

(Doc. #120-1 at ECF 107; Doc. #120-2 at ECF 121; Doc. #120-3 at ECF 119; Doc. #120-4 at ECF 119).

---

[1]     "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

Second, for covered prescription drugs purchased from Oxford's mail order supplier, plaintiff was "responsible for paying the lower of": (i) "the applicable Out-of-Pocket Expense"; or (ii) "the Prescription Drug Cost for that Prescription Drug Product," meaning the rate Oxford agreed to reimburse its Network Pharmacies (the "Pharmacy Rate"). (Doc. #120-1 at ECF 105, 108; Doc. #120-2 at ECF 119, 122; Doc. #120-3 at ECF 117, 120; Doc. #120-4 at ECF 117, 120).

In addition to the Certificate of Coverage and Drug Rider, from 2011 to 2013 Oxford also circulated a "Member Handbook" to plan members. Relevant here, the Member Handbook stated:

> In-Network benefits are typically provided through arrangements with Network Providers. Network Providers have agreed to accept our contracted fees as payment in full for Covered Services. **We reimburse the Network Provider directly when you receive Covered Services and you will not be responsible for any amount billed in excess of the contracted fee for the Covered Service**.

(Doc. #120-2 at ECF 66; Doc. #120-3 at ECF 64; Doc. #120-4 at ECF 64 (emphasis added)).

For those years, "Network Provider" was defined in the Certificate of Coverage as:

> A Physician, Certified Nurse Midwife, Hospital, Skilled Nursing Facility, Home Health Care Agency, or any other duly licensed or certified institution or health professional under contract with Us to provide Covered Services to Members. A list of Network Providers and their locations is available to you upon enrollment or upon request. The list will be revised from time to time by Us.

(Doc. #120-2 at ECF 115; Doc. #120-3 at ECF 113; Doc. #120-4 at ECF 113).

B.   2014 to 2016 Plan

From 2014 to 2016, plaintiff's prescription drug coverage was outlined in the plan's Certificate of Coverage, not a rider. The "Prescription Drug Coverage" section of the Certificate set forth plaintiff's payment obligations for covered outpatient prescription drugs, which again differed depending on how plaintiff purchased them.

3

First, for covered prescription drugs purchased from a "Participating Pharmacy," plaintiff was "responsible for paying the lower of:"  (i) "[t]he applicable Cost-Sharing"; or (ii) "[t]he Participating Pharmacy's Usual and Customary Charge (which includes a dispensing fee and sales tax) for the Prescription Drug."  (Doc. #120-6 at ECF 8; Doc. #120-8 at ECF 18; Doc. #120-10 at ECF 18).

Plaintiff's "applicable Cost-Sharing" amount was set out in the "Schedule of Benefits." (Doc. #120-6 at ECF 7–8; Doc. #120-8 at ECF 17–18; Doc. #120-10 at ECF 17–18).

A "Participating Pharmacy" was defined as:

A pharmacy that has
- Entered into an agreement with Us or Our designee to provide Prescription Drugs to Members;
- agreed to accept specified reimbursement rates for dispensing Prescription Drugs; and
- has been designated by Us as a Participating Pharmacy.

(Doc. #120-6 at ECF 15; Doc. #120-8 at ECF 25; Doc. #120-10 at ECF 26).

Second, for covered prescription drugs purchased from Oxford's mail order supplier, plaintiff was "responsible for paying the lower of":  (i) "the applicable Out-of-Pocket Expense"; or (ii) "the Prescription Drug Cost for that Prescription Drug Product."  (Doc. #120-6 at ECF 10; Doc. #120-8 at ECF 20; Doc. #120-10 at ECF 20).

A separate section of the Certificate of Coverage stated that, in the case of co-payments:

Except where stated otherwise, after You have satisfied the annual Deductible . . . , You must pay the Copayments, or fixed amounts, in the Schedule of Benefits . . . for Covered Services.  **<u>However, when the Allowed Amount for a service is less than the Copayment, You are responsible for the lesser amount.</u>**

(Doc. #120-5 at ECF 47 (emphasis added); <u>accord</u> Doc. #120-7 at ECF 58; Doc. #120-8 at ECF 57).

4

For "Participating Providers," the "Allowed Amount" was defined as "the amount [Oxford] ha[s] negotiated with the Participating Provider."  (Doc. #120-5 at ECF 48; Doc. #120-7 at ECF 59; Doc. #120-8 at ECF 58).

"Participating Provider" was defined through the following series of definitions.

First, a "Participating Provider" was defined as "[a] Provider who has a contract with Us to provide services to You."  (Doc. #120-5 at ECF 40; Doc. #120-7 at ECF 49; Doc. #120-9 at ECF 46).

Second, a "Provider" was defined as "[a] Physician (M.D. – Medical Doctor or D.O. – Doctor of Osteopathic Medicine), licensed Health Care Professional or Facility licensed, certified or accredited as required by state law."  (Doc. #120-5 at ECF 41; Doc. #120-7 at ECF 50; Doc. #120-9 at ECF 47).

Third, "Facility" was defined as:

> A Hospital; ambulatory surgery Facility; birthing center; dialysis center; rehabilitation Facility; Skilled Nursing Facility; hospice; home health agency or home care services agency certified or licensed under Article 36 of the New York Public Health Law; a comprehensive care center for eating disorders pursuant to article 27-J of the public health law; an institutional Provider of mental health of chemical dependence and abuse treatment operating under Article 31 of the New York Mental Hygiene Law and/or approved the Office of Alcoholism and Substance Abuse Services, or other Provider certified under Article 28 of the New York Public Health Law (or other comparable state law, if applicable).

(Doc. #120-5 at ECF 37–38; accord Doc. #120-7 at ECF 46–47; Doc. #120-9 at ECF 43–44).

II.    Procedural History

Plaintiff commenced this action on February 16, 2018.

Plaintiff alleges defendants violated the terms of the plan by overcharging her for prescription drugs.  Specifically, plaintiff claims she purchased covered prescription drugs from Network and Participating Pharmacies and, pursuant to the plan, she should have paid the

"lesser-of-three" amounts:  (i) her cost-sharing obligation such as, for example, a co-payment; (ii) the Usual and Customary Charge for that drug; or (iii) the Pharmacy Rate.  Plaintiff alleges instead she was charged the "lesser-of-two" amounts for covered prescription drugs:  (i) her co-payment; or (ii) the Usual and Customary Charge.

According to plaintiff, the Pharmacy Rate was lower than her co-payments or the Usual and Customary Charge, and she was thus consistently overcharged for covered prescription drugs.  Further, plaintiff asserts defendants conspired together and with the pharmacies to overcharge her, to conceal their scheme from plan members, and ultimately to pocket the overcharges for themselves.

In her amended and operative complaint (Doc. #47), plaintiff asserted two categories of claims.

First, on behalf of a putative subclass of all enrolled in a health plan issued or administered by Oxford and subject to ERISA and who overpaid for prescription drugs, she asserted six ERISA claims:  (i) a claim for benefits pursuant to ERISA § 502(a)(1)(B) (Count I); (ii) causing a prohibited transaction in violation of ERISA § 406(a)(1)(C)–(D) (Count II); (iii) breach of fiduciary duty in violation of ERISA § 406(b) (Count III); (iv) breach of the duties of loyalty, care, skill, and prudence in violation of ERISA §§ 404, 409 (Count IV); (v) breach of fiduciary duties by co-fiduciaries pursuant to ERISA § 405(a) (Count V); and (vi) liability for knowing participation in breach of fiduciary duties pursuant to ERISA § 502(a)(3) (Count VI).

Second, on behalf of a nationwide class of all enrolled in a health plan issued or administered by Oxford and who overpaid for prescription drugs, she asserted three RICO claims:  (i) violation of RICO § 1962(c) against Oxford (Count VII); (ii) violation of RICO

§ 1962(c) against Optum (Count VIII); and (iii) conspiracy to violate RICO against all defendants (Count IX).

On March 28, 2019, the Court granted in part and denied in part defendants' motion to dismiss the amended complaint. (Doc. #63). Specifically, the Court dismissed Count VII in its entirety, dismissed Count IX as to OptumRx only, and permitted all other claims to proceed.

## DISCUSSION

I.   Summary Judgment Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[2]

A fact is material when it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See id. It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The

---

[2]      Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

7

non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). "[T]he mere existence of a scintilla of evidence" supporting the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for it. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If "there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party" on the issue on which summary judgment is sought, "summary judgment is improper." See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

II.     ERISA Claims

Defendants contend they are entitled to summary judgment on all of plaintiff's ERISA claims because, among other things, there is no genuine dispute of material fact that defendants complied with the negotiated terms of the plan.

The Court agrees.

A.     Legal Standard

"ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989). To that end, ERISA "provid[es] insurance, specif[ies] certain plan characteristics in detail, and . . . set[s] forth certain general fiduciary duties

applicable to the management of . . . benefit plans."  Varity Corp. v. Howe, 516 U.S. 489, 496 (1996).

For one, the statute provides a private right of action for a plan participant or beneficiary "to recover benefits due to him under the terms of the plan, to enforce his rights under the plan, or to clarify his rights to future benefits under the terms of the plan."  ERISA § 502(a)(1)(B). When a plan vests an administrator with discretionary authority to decide benefit claims, any denial of benefits "is reviewed under the arbitrary and capricious standard."  Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 622 (2d Cir. 2008).  Otherwise, any denial is reviewed de novo. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. at 115.

For another, ERISA imposes general duties of "care, skill, prudence, and diligence" on plan fiduciaries.  Henry v. Champlain Enters., Inc., 445 F.3d 610, 618 (2d Cir. 2006) (quoting ERISA § 404(a)(1)(B)).  To that end, ERISA specifically "prohibit[s] certain categories of transactions believed to pose of high risk of fiduciary self-dealing."  Id. (citing ERISA § 406).

Moreover, ERISA imposes liability on co-fiduciaries for knowingly participating in or otherwise enabling a breach of ERISA, ERISA § 405(a), as well as on certain non-fiduciaries for knowingly participating in or otherwise enabling specific breaches of ERISA.  See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 248–51 (2000).

That said, ERISA also requires a fiduciary to "discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" the statute.  ERISA § 404(a)(1)(D).  Thus, "adherence to [negotiated plan] terms by a plan administrator cannot constitute a breach of its fiduciary duties, barring a grant of discretionary authority to the fiduciary."  Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 29 (2d Cir. 2002).  For example, a plan

administrator does not violate the prohibited transaction rules set forth in ERISA § 406 when it uses plan assets to satisfy a money judgment against the plan that the plan is legally required, rather than granted discretion, to satisfy.  See Milgram v. Orthopedic Assocs. Defined Contribution Pension Plan, 666 F.3d 68, 77 (2d Cir. 2011).

ERISA plans are interpreted "by looking to the terms of the plan as well as to other manifestations of the parties' intent."  US Airways, Inc. v. McCutchen, 569 U.S. 88, 102 (2013). However, when the "words of a plan . . . leave gaps," courts "must often look outside the plan's written language to decide what an agreement means."  Id.

B.    Analysis

Here, there is no genuine dispute of material fact that defendants complied with the terms of the plan.  As a result, they are entitled to judgment as a matter of law on plaintiff's ERISA claims.

At all times, plaintiff's Certificate of Coverage included a New York choice-of-law provision.  As a result, the Court concludes (and the parties agree) that New York contract law applies to its interpretation.  See Arnone v. Aetna Life Ins. Co., 860 F.3d 97, 108 (2d Cir. 2017).

Under New York law, contract interpretation is the determination of the intent of the parties, the "best evidence" of which is the parties' written agreement.  Tomhannock, LLC v. Roustabout Res., LLC, 33 N.Y.3d 1080, 1082 (2019).  Courts must "enforce a clear and complete written agreement according to the plain meaning of its terms, without looking to extrinsic evidence to create ambiguities not present on the face of the document."  N.Y.C. Off-Track Betting Corp. v. Safe Factory Outlet, Inc., 28 A.D.3d 175, 177 (1st Dep't 2006).

Words in a contract shall be given their "ordinary and natural meaning."  See, e.g., Banco Espírito Santo, S.A. v. Concessionária Do Rodonel Oeste S.A., 100 A.D.3d 100, 107 (1st Dep't

2012).  That said, a "word may not be read in isolation"; instead, "its meaning must be derived from the context of the agreement."  Bregoff v. Rubien, 12 A.D.2d 92, 94 (1st Dep't 1960), aff'd, 10 N.Y.2d 763 (1961).

It is also "a well-settled rule" of contract interpretation that "[w]here certain things are enumerated, and such enumeration is followed or coupled with a more general description, such general description is commonly understood to cover only things ejusdem generis"—that is, of the same kind or class—"with the particular things mentioned."  Krulewitch v. Nat'l Importing & Trading Co., 195 A.D. 544, 546 (1st Dep't 1921); Ejusdem Generis, Black's Law Dictionary (11th ed. 2019) ("[W]hen a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed.").

Further, when a contract omits a term typically included in similar contracts, "the inescapable conclusion is that the parties intended the omission."  Quadrant Structured Prods. Co. v. Vertin, 23 N.Y.3d 549, 560 (2014).

Moreover, contracts should be interpreted to give each provision meaning and effect, and they should not be read such that any provision is rendered "meaningless or without force or effect."  Ronnen v. Ajax Elec. Motor Corp., 88 N.Y.2d 582, 589 (1996).

    1.    2010 to 2013 Plan

Considering these principles of contract law, the Court finds defendants have shown they complied with the plan from 2010 to 2013.  That is, defendants have established plaintiff was not entitled to pay the Pharmacy Rate for covered prescription drugs purchased from Network

11

Pharmacies and thus they did not violate the plan terms when charging her the lesser of her cost-sharing obligation or the Network Pharmacy's Usual and Customary Charge.[3]

The Drug Rider included a specific provision on what members were required to pay for prescription drugs purchased from Network Pharmacies.  According to the provision's plain language, plaintiff was responsible for paying for the lesser-of-two options for covered prescription drugs from Network Pharmacies:  (i) the cost-sharing obligation set out in the Summary of Benefits; or (ii) the Network Pharmacy's Usual and Customary Charge.  There is no mention of the Pharmacy Rate.

The Drug Rider separately provided, for covered drugs purchased from Oxford's mail order supplier, members were entitled to pay the Pharmacy Rate.  That is, defendants knew how to draft a plan provision offering members the option of paying the Pharmacy Rate for prescription drugs, and deliberately chose not to do so for drugs purchased from Network Pharmacies.  See In re Ore Cargo, Inc., 544 F.2d 80, 82 (2d Cir. 1976) (sophisticated commercial lender deliberately chose not to convey a security interest in tort claims when the underlying contract specifically conveyed a security interest in a list of enumerated property interests which did not include tort claims).

In other words, the plain language of the Drug Rider and the presence of the provision on mail-order purchases demonstrate a clear intent not to offer plan members the Pharmacy Rate for prescription drugs purchased from Network Pharmacies.

---

[3]    In her counterstatement of material facts, plaintiff "denie[d] that her claims do not include prescription drugs purchased through mail order, though the vast majority of claims at issue were purchased at a retail Network Pharmacy."  (Doc. #131 ¶ 38).  However, in support, she cites generally to the amended complaint (id.), which nowhere alleges she purchased covered prescription drugs from Oxford's mail order supplier.  Thus, the Court rejects plaintiff's assertion as unsupported.

The Member Handbook, even assuming it is a plan document,[4] does not alter the Court's conclusion.

The Member Handbook stated that, for "Covered Services" performed by "Network Providers," plan members "w[ould] not be responsible for any amount billed in excess of the contracted fee for the Covered Service." (E.g., Doc. #120-2 at ECF 66). Plaintiff contends "Network Provider" encompasses a "Network Pharmacy," and the Member Handbook thus entitled plaintiff to pay "the contracted fee"—that is, the Pharmacy Rate—for covered outpatient prescription drugs purchased from a Network Pharmacy. For several reasons, this argument is unavailing.

First, Network Provider was not intended to include Network Pharmacies. The terms "Network Provider" and "Network Pharmacy" are defined separately in the Certificate of Coverage. That the terms were separately defined illustrates they were intended to mean different things. Cf. Shionogi Inc. v. Andrx Labs, LLC, 187 A.D.3d 420, 421 (1st Dep't 2020).

Moreover, plaintiff's interpretation of Network Provider is contrary to the established rule of ejusdem generis. Network Provider was defined as "[a] Physician, Certified Nurse Midwife, Hospital, Skilled Nursing Facility, Home Health Care Agency, or any other duly licensed or certified institution or health professional under contract with Us to provide Covered Services to Members." (E.g., Doc. #120-2 at ECF 115). Thus, "any other duly licensed or certified institution or health professional," a general term which is preceded by a list of specific terms, must be limited to include only items of the same type as those specific terms. See, e.g.,

---

[4]     The parties disagree about the import of the Member Handbook. According to defendants, the Member Handbook was not part of the plan, but a guide for plan members to access their benefits. According to plaintiff, the Member Handbook was a plan document that, together with the Certificate of Coverage and Summary of Benefits, sets forth its terms and conditions.

Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc., 84 N.Y.2d 430, 438 (1994).  A pharmacist who prepares and dispenses medication, although licensed, is not of the same type as a physician or certified nurse midwife who practices medicine and, among other things, delivers babies. Retail pharmacies that sell prescription and over-the-counter medication, similarly, are not of the same type as hospitals, skilled nursing facilities, or home health care agencies, which provide emergency and long-term care to the ill and injured.

Further, even if the Court considered plaintiff's extrinsic evidence on this point—which it may not absent ambiguity in the contract—plaintiff's evidence does not support her position. Plaintiff cites testimony by defendants' Rule 30(b)(6) witness, but the witness actually testified that Network Pharmacies were "not considered" Network Providers.  (Doc. #120-21, at 65).

Second, to construe the Member Handbook as plaintiff suggests would render the provision of the Certificate of Coverage establishing the price of covered prescription drugs essentially meaningless, which is disfavored under New York law.  See Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 63 N.Y.2d 396, 404 (1984).

Third, "[e]ven if there was an inconsistency between a specific provision"—such as the Network Pharmacies clause in the Drug Rider—"and a general provision of a contract"—such as the language plaintiff cites from the Member Handbook—"the specific provision controls." Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46–47 (1956).  That is, even if there were an inconsistency between the Drug Rider and the Member Handbook, the Drug Rider would control, and plaintiff would not be entitled to pay the Pharmacy Rate.

Thus, defendants have shown they complied with the terms of the plan from 2010 to 2013 as a matter of law.

14

2.      2014 to 2016 Plan

Defendants have also shown they complied with the plan from 2014 to 2016.  That is, defendants have established plaintiff was not entitled to pay the Pharmacy Rate for covered prescription drugs purchased from Participating Pharmacies and thus they did not violate the plan by charging plaintiff the lesser of her cost-sharing obligation or the Participating Pharmacy's Usual and Customary Charge.

From 2014 to 2016, the Certificate of Coverage included a specific provision on what members were required to pay for prescription drugs purchased from Participating Pharmacies. According to its plain language, plaintiff was responsible for paying the "lesser-of-two" options for outpatient prescription drugs:  (i) the cost-sharing obligation set out in her Schedule of Benefits; or (ii) the Participating Pharmacy's Usual and Customary Charge.  There is no mention of the Pharmacy Rate.

Plaintiff argues this provision was modified by a provision in a different part of the Certificate of Coverage, which stated that "when the Allowed Amount for a service is less than the Copayment, You are responsible for the lesser amount."  (E.g., Doc. #120-5 at ECF 47). Plaintiff contends she was thus entitled to pay the lesser-of-three options for outpatient prescription drugs purchased from Participating Pharmacies:  (i) the cost-sharing obligation in her Schedule of Benefits; (ii) the Usual and Customary Charge; or (iii) the "Allowed Amount," which plaintiff contends is the Pharmacy Rate.  This argument is unavailing for several reasons.

First, to give effect to this language would be to render the Participating Pharmacies provision in the Certificate of Coverage meaningless, which is disfavored under New York law. Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 63 N.Y.2d at 404.

Second, the Certificate of Coverage established that, for covered prescription drugs purchased from Oxford's mail order supplier, members <u>were</u> entitled to pay the Pharmacy Rate. As with the 2010 to 2013 plan, this provision shows defendants knew how to draft a plan provision offering members the option of paying the Pharmacy Rate, but deliberately chose not to do so for prescription drugs purchased from a Participating Pharmacy.  <u>In re Ore Cargo, Inc.</u>, 544 F.2d at 82.

Third, plaintiff's argument rests on the contention that a Participating Provider encompasses a Participating Pharmacy.  Specifically, plaintiff argues a Facility, which is included in the definition of Provider, in turn includes retail pharmacies.  This reading of the plan is contrary to New York law of contract interpretation.

For one, like with Network Providers and Network Pharmacies in the 2010 to 2013 plan, Participating Providers and Participating Pharmacies are separately defined in the 2014 to 2016 plan, which indicates the parties intended for them to mean separate things.  <u>Cf.</u> <u>Shionogi Inc. v. Andrx Labs, LLC</u>, 187 A.D.3d at 421.

For another, plaintiff's interpretation is again contrary to the rule of <u>ejusdem</u> <u>generis</u>.  A "Facility" was defined in the plan as:

> A Hospital; ambulatory surgery Facility; birthing center; dialysis center; rehabilitation Facility; Skilled Nursing Facility; hospice; home health agency or home care services agency certified or licensed under Article 36 of the New York Public Health Law; a comprehensive care center for eating disorders pursuant to article 27-J of the public health law; an institutional Provider of mental health of chemical dependence and abuse treatment operating under Article 31 of the New York Mental Hygiene Law and/or approved the Office of Alcoholism and Substance Abuse Services, **or other Provider certified under Article 28 of the New York Public Health Law (or other comparable state law, if applicable)**.

(<u>E.g.</u>, Doc. #120-5 at ECF 37–38 (emphasis added)).  Plaintiff argues that "other Provider" in this definition includes pharmacies because pharmacies are certified under state law.  But "other

Provider" is a general term that must be limited by the specific terms that precede it.  See, e.g., Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc., 84 N.Y.2d at 438.  The specific terms that precede "other Provider" are facilities that offer emergency or long-term medical care, neither of which a retail pharmacy offers.

Thus, defendants have shown they complied with the terms of the plan from 2014 to 2016 as a matter of law.

\*          \*          \*          \*          \*

Because defendants have shown they complied with the terms of the plan, plaintiff's claims that defendants breached the duties imposed by ERISA (Counts II–V) must be dismissed. Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d at 29.

Moreover, plaintiff's ERISA benefit claim (Count I) and derivative claim (Count VI) must also be dismissed.  First, plaintiff's claim for benefits fails because she was not entitled to the benefits she sought, namely, the Pharmacy Rate for covered prescription drugs.

Second, plaintiff's claim that defendants "knowingly participated" in breaches of fiduciary duty fails in the absence of any underlying breach.  See, e.g., Rosen v. Prudential Ret. Ins. & Annuity Co., 2016 WL 7494320, at \*11 (D. Conn. Dec. 30, 2016) ("Without an underlying breach of fiduciary duty or breach of trust on the part of a Plan fiduciary, Prudential cannot be held liable for a knowing participating in a breach of trust."), aff'd, 718 F. App'x 3 (2d Cir. 2017) (summary order).

Accordingly, plaintiff's ERISA claims must all be dismissed.

III.    RICO Claims

Defendants contend plaintiff's RICO claims must be dismissed because there is no genuine dispute of material fact respecting defendants' adherence to plan terms.

The Court agrees.

"To establish a RICO claim, a plaintiff must show:  (1) a violation of the RICO statute; (2) an injury to business or property; and (3) that the injury was caused by the violation of [the RICO statute]."  Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 120 (2d Cir. 2013).

For RICO claims pursuant to Section 1962(c), a plaintiff must show, among other things, "a pattern . . . of racketeering activity," which requires "at least two predicate acts" of racketeering.  DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001).  Thus, summary judgment is appropriate on a Section 1962(c) claim absent any record evidence of requisite predicate acts.  See, e.g., Valentini v. Penn Mut. Life Ins. Co., 850 F. Supp. 2d 445, 451 (S.D.N.Y. 2012) ("Summary judgment dismissing a RICO claim predicated on embezzlement from an ERISA plan should be granted when the evidence in the record shows that no assets where embezzled from the ERISA plan."), aff'd, 511 F. App'x 57 (2d Cir. 2013) (summary order).

The RICO claims here are predicated on various forms of fraud.  Specifically, plaintiff contends the plan entitled her to pay the Pharmacy Rate for covered prescription drugs from certain pharmacies, and instead defendants intentionally overcharged her and schemed together with those pharmacies to hide the overcharges and claw back them back for their own benefit.  However, as explained above, plaintiff was not entitled to pay the Pharmacy Rate for covered prescription drugs and was not overcharged for those drugs.  As a result, there is no evidence of any underlying fraud by defendants and plaintiff's substantive RICO claims must be dismissed.

Because plaintiff's substantive RICO claims must be dismissed, plaintiff's RICO conspiracy claim must also be dismissed.  See, e.g., Medinol Ltd. v. Boston Sci. Corp., 346 F. Supp. 2d 575, 616 (S.D.N.Y. 2004).

Accordingly, plaintiff's RICO claims must all be dismissed.

18

## CONCLUSION

The motion for summary judgment is GRANTED.

The Clerk is directed to terminate the motion (Doc. #117) and close this case.

Dated: February 22, 2022
      White Plains, NY

             SO ORDERED:

             _____

             Vincent L. Briccetti
             United States District Judge